MARGARET E. OSBORN, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Osborn v. Commissioner
Docket No. 35151-85
United States Tax Court
T.C. Memo 1993-312; 1993 Tax Ct. Memo LEXIS 312; 66 T.C.M. (CCH) 135; July 15, 1993, Filed *312 Decision will be entered under Rule 155. Petitioner (P) and her former husband (H) filed joint Federal income tax returns for 1979, 1980, and 1981, the taxable years in issue. Respondent subsequently disallowed various losses and deductions on these returns, attributable to certain investments of H that respondent determined to be abusive tax shelters and tax-motivated transactions. During the years in issue, H made all business decisions and did not consult P with respect to the couple's finances. P and H did not hold a joint bank account, and P relied upon H to prepare the couple's joint Federal income tax returns. P contends that she is entitled to relief from joint and several liability with regard to the deficiencies and additions to tax for the years in issue, pursuant to the "innocent spouse" provision of sec. 6013(e), I.R.C.Held: Petitioner is entitled to "innocent spouse" relief under sec. 6013(e), I.R.C., for the 1979 and 1980 taxable years, but not for the 1981 taxable year. For petitioner: David E. Brockway. For respondent: Steven M. Diamond. LARO
LARO
MEMORANDUM FINDINGS OF FACT AND OPINION LARO, Judge: This case is before the Court pursuant to the filing *313 of a petition by Margaret E. Osborn (petitioner) for a redetermination of respondent's determinations set forth in the notice of deficiency issued on June 13, 1985, to petitioner and her former husband, Dennis Lon Osborn (Osborn). The notice reflects respondent's determinations of deficiencies in, and additions to, the Federal income taxes of petitioner and Osborn as follows: Additions to Tax Sec.
Sec.
Year
Deficiency
6653(a)(1) [1]1
6653(a)(2)
1977
$    514.16
$    25.71
-0-
1979
49,204.12
2,460.21
-0-
1980
60,078.00
3,003.90
-0-
1981
52,850.25
2,642.51
[2]
Respondent also determined that the underpayment of Federal income taxes for the 1979, 1980, and 1981 taxable years was substantial and attributable to tax-motivated transactions within the meaning of section 6621(c), formerly section 6621(d). [1] Accordingly, respondent determined that the annual rate of interest payable on the entire underpayment for those years was 120 percent of the adjusted *314 rate established under section 6621(b). Osborn is not a petitioner in this case. After concessions by the parties, the sole issue for decision is whether petitioner is entitled to "innocent spouse" relief from joint Federal income tax liability, under section 6013(e), for the 1979, 1980, and 1981 taxable years. [2] We hold that petitioner is entitled to "innocent spouse" relief for the 1979 and 1980 taxable years, but not for the 1981 taxable year. *315 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulations and accompanying exhibits are incorporated herein by this reference. At the time the petition was filed, petitioner resided in Los Angeles County, California. During the years in issue, petitioner was married to Osborn; they filed Federal income tax returns using the status of "Married filing joint return". Petitioner and Osborn were married on May 14, 1966. At that time, petitioner was 21 years old. Osborn, now deceased, was 18 years her senior. Osborn had been married previously, and had four children from that marriage. Petitioner and Osborn had three children during their marriage. Petitioner was raised on family-owned property in Nathrop, Colorado, a resort entitled Mt. Princeton Hot Springs (Mt. Princeton). Mt. Princeton was held by a corporation, the stock of which was owned by petitioner's parents and, later, by Osborn's parents. During their marriage, petitioner and Osborn acquired all the shares of this corporation through gifts and other means. Petitioner graduated from Loretto Heights College in Denver, Colorado, with a bachelor of arts in history and a minor in education. *316 Petitioner received a teaching certificate from the State of Colorado. Prior to the years in issue, petitioner taught second grade for 1 year and did some administrative tasks (e.g., taking reservations and deposits) at Mt. Princeton. During the years in issue, petitioner was a housewife and Osborn was a builder employed by his own company, the Dennis Osborn Building Co. Osborn received a degree in architectural engineering from the University of Texas and served in the United States Navy during World War II. From 1966 (the year of petitioner's marriage to Osborn) to 1975, Osborn lived with petitioner at Mt. Princeton, and he built and developed houses on the property. Osborn also subdivided land and built houses near Mt. Princeton beginning in 1972. In or about 1975, Osborn moved to his mother's house in Houston and started a construction business. Petitioner and her three children remained at Mt. Princeton. Occasionally, on weekends, Osborn visited petitioner and their children. In 1979, petitioner and the children joined Osborn in Houston and occupied a house that he built. For about a year, the house was sparsely furnished with mattresses on the floor, a television *317 set, a card table, and folding chairs. During petitioner's marriage to Osborn, he was violent and abusive. He struck petitioner, threatened her with bodily harm, and attempted to injure her (e.g., on numerous occasions, Osborn tried to "run petitioner off the road"). Osborn was also a domineering husband. He maintained an office at home, which was kept locked and into which petitioner and the children were forbidden to enter. Osborn did not allow anyone to go into the room without his permission, and, as testified to by petitioner's daughter, whom we find to be highly credible, if petitioner ever went into the room, she "would be yelled at [by Osborn] severely". Petitioner generally did not disobey him. Osborn never discussed with petitioner his personal business affairs, the family's business affairs, or the family's financial affairs. Although petitioner was aware in 1979 of one of Osborn's investments, [3] *318 she knew nothing about it (e.g., petitioner did not know the purchase price, why Osborn purchased it, or that tax benefits were involved). [4]
During their marriage, petitioner and her children did not have an extravagant lifestyle. Petitioner clipped coupons and shopped for the family's clothes at a discount store, based on her assumption that she and Osborn were having financial difficulties. Petitioner neither derived income from Osborn's business dealings, nor had any money of her own. Petitioner never held a joint bank account with Osborn and did not hold a separate bank account until she moved to Houston in 1979. Osborn opened that separate account for petitioner to pay for their children's expenses; Osborn maintained the account's *319 balance at $ 250. Petitioner had to ask Osborn for money whenever she shopped for groceries; Osborn never gave her any money until it was time to do so. Osborn never discussed tax matters with petitioner. With respect to their pre-1980 joint Federal income tax returns, petitioner was merely shown where to sign, and was never allowed to see beyond the signature page. For all the pre-1980 joint taxable years, petitioner simply signed the returns without review. Petitioner did not ask to review these returns because she believed it was not necessary; for all joint taxable years up until 1981, petitioner "trusted Osborn". Moreover, petitioner believed Osborn would not permit her to review the returns. Osborn ridiculed petitioner for her interest in anything. Petitioner customarily signed, without question, documents that Osborn put in front of her. In or around the beginning of 1982, petitioner entered the office when Osborn telephoned her and directed her to retrieve a telephone number from the room. While in the office, petitioner saw a letter on the desk involving the estate of Osborn's mother. This letter aroused petitioner's suspicion. Based on this letter, petitioner *320 sensed that Osborn had defrauded his mother and his sister. Osborn became violent when petitioner confronted him about the letter. In June 1982, petitioner separated from Osborn, and moved from Houston to Colorado. At or about the same time, petitioner retained an attorney to represent her in a divorce action against Osborn, and filed a petition for divorce from Osborn with the District Court of Chaffee County, Colorado. On or about August 17, 1982, Osborn filed a petition for divorce from petitioner with the District Court of Harris County, Texas. The District Court in Colorado dismissed petitioner's action in its Court in favor of Osborn's action in the Texas Court. On January 12, 1984, the District Court of Harris County, Texas, granted Osborn's request for a divorce from petitioner; a divorce decree was issued on February 21, 1984. Pursuant to the decree, petitioner received: (1) A $ 500,000 promissory note, secured by Mt. Princeton, bearing interest at 10 percent per year and payable in five equal annual installments commencing on January 12, 1985; (2) a $ 250,000 real estate note, secured by land in Harris County, Texas, [5] payable in full on or before April 15, 1984; *321 (3) alimony of $ 3,000 per month for 121 months, commencing on February 5, 1984, and secured by a promissory note of $ 363,000, which, in turn, was secured by a deed of trust on Mt. Princeton; (4) 40 acres of land in Nathrop, Colorado, which was developed by Osborn before the years at issue; (5) one-half of Osborn's interests in: (i) First Western Government Securities (FWGS), (ii) Mohave Minerals, Ltd. (Mohave), a limited partnership of which Osborn was a limited partner, (iii) Conveyer Products, Ltd. (Conveyor), another limited partnership of which Osborn was a limited partner, and (iv) JRK, Ltd. (JRK), a third limited partnership of which Osborn was a limited partner; and (6) one-half of minimal moneys in three bank accounts in Colorado. On their 1979 Federal income tax return, petitioner and *322 Osborn, in relevant part: (1) Reported losses of: (i) $ 97,444 with respect to FWGS, an Illinois corporation from which Osborn purchased portfolios of forward contracts for mortgage-backed securities of the Government National Mortgage Association, and (ii) $ 42,147 with respect to Mohave; and (2) claimed a refund of $ 32,396.23. [6] This refund was issued to petitioner and Osborn on July 21, 1980. Petitioner does not recall seeing or signing this refund check. With further respect to the 1979 taxable year, petitioner and Osborn "carried *323 back" to the 1977 year an investment tax credit that arose in 1979 from Osborn's investment in Mohave. The claimed refund for the 1977 taxable year was $ 514.16, and this refund was issued to petitioner and Osborn on September 15, 1980. Petitioner does not recall seeing or signing this refund. The parties jointly stipulated before trial that petitioner is not entitled to this investment tax credit carryback. [7]
On their 1980 Federal income tax return, petitioner and Osborn, in relevant part: (1) Reported losses of: (1) $ 176 with respect to FWGS, (ii) $ 10,212 with respect to Mohave, and (iii) $ 77,164 with respect to Conveyor; (2) reported a $ 13,892 net operating loss carryover *324 from 1979 attributable to Osborn's investment in FWGS and Mohave; (3) claimed a $ 2,000 miscellaneous deduction for professional fees; and (4) claimed a refund of $ 38,497. The 1980 return bore petitioner's purported signature; but petitioner never signed the return. Rather, another person forged petitioner's signature on the 1980 return. [8] The 1980 refund was issued jointly to petitioner and Osborn on August 24, 1981. Petitioner does not recall seeing or signing this refund check. The parties jointly stipulated before trial that petitioner was entitled to a $ 29,099 loss with respect to Conveyor. [9]
Osborn's accountant in Houston *325 prepared a joint 1981 Federal income tax return for petitioner and Osborn. At this time, Osborn lived in Houston and petitioner lived in a separate household in Colorado. The prepared return was delivered to petitioner in Colorado for her review and signature. On the 1981 return, petitioner and Osborn, in relevant part: (1) Reported losses of: (i) $ 16,456 with respect to FWGS, (ii) $ 2,775 with respect to Mohave, (iii) $ 79,628 with respect to JRK, and (iv) $ 2,752 with respect to Conveyor; (2) reported an interest deduction of $ 351 with respect to Conveyor; (3) claimed a refund of $ 58,118; and (4) requested that the $ 58,118 refund be applied to their 1982 Federal income tax liability. The parties jointly stipulated before trial that petitioner was entitled to 1981 losses of $ 2,752, with respect to Conveyor, and of $ 13,957.54, with respect to JRK. [10]
*326 Before signing the 1981 Federal income tax return, petitioner reviewed the prepared return with her attorney. With his help, petitioner was able to understand the contents of the return. Petitioner was uncomfortable with the losses claimed on the 1981 return, and initially refused to sign it. She was aware that the investments in Mohave, Conveyor, and JRK were included on the return and was "shocked" by them. Petitioner signed the return. The return included a disclaimer, prepared by her attorney, stating "The Osborns are in the midst of a divorce proceeding and Mrs. Osborn disclaims any knowledge of the income or deductions claimed on the 1040 prepared under the directions of Dennis Osborn". Petitioner questioned neither Osborn nor his accountant about the return. Osborn did not threaten or otherwise force petitioner to sign the return. Petitioner and Osborn filed a 1982 Federal income tax return using the status of "Married filing joint return". The $ 58,118 refund from the 1981 taxable year was credited to the 1982 joint Federal income tax liability of petitioner and Osborn. The 1982 return claimed a refund of $ 34,377 and directed that this refund be credited to the *327 1983 taxable year. Subsequently, respondent applied $ 6,395.88 of this claimed refund to an outstanding tax liability of petitioner and Osborn for their 1978 joint taxable year. Petitioner and Osborn both filed Federal income tax returns for the 1983 taxable year using the status of "Married filing separate return". Petitioner's separate 1983 Federal income tax return was prepared by Osborn's accountant. The $ 34,377 refund from the 1982 taxable year, reduced by the $ 6,395.88 applied to 1978, was initially credited solely to Osborn's 1983 Federal income tax liability. Afterwards, petitioner's half of the net refund ($ 14,246) was transferred to offset her individual liability for the 1983 taxable year. Petitioner's 1983 Federal income tax return claimed this amount as applied from the 1982 taxable year. Petitioner subsequently was issued a refund of $ 12,148 for the 1983 taxable year. OPINION Spouses generally are jointly and severally liable for income taxes due on a joint Federal income tax return. Sec. 6013(d)(3); Guth v. Commissioner, 897 F.2d 441 (9th Cir. 1990), affg. T.C. Memo. 1987- 522. Prior to 1971, both *328 spouses were strictly liable for tax deficiencies resulting from an unknown, erroneous omission or deduction solely attributable to one spouse, although the unknowing spouse was totally "innocent". Guth v. Commissioner, supra at 442-443. In 1971, Congress remedied this inequity by enacting an "innocent spouse" provision to protect one spouse from the overreaching or dishonesty of the other. Purcell v. Commissioner, 826 F.2d 470 (6th Cir. 1987), affg. 86 T.C. 228 (1986). Under its current version, the "innocent spouse" provision of section 6013(e)[11] relieves a spouse of joint Federal income tax liability if the following four elements are met: (1) A joint Federal income tax return was filed by the spouses; (2) there is a substantial understatement of tax attributable to grossly erroneous items of the other spouse; (3) in signing the return, the claimed "innocent spouse" did not know, and had no reason to know, of the substantial understatement; and (4) taking into account all the facts and circumstances, it would be inequitable to hold this claimed "innocent spouse" liable for the deficiency *329 attributable to the understatement. Sec. 6013(e)(1). Petitioner bears the burden of proving that each of these elements is satisfied. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933); Shea v. Commissioner, 780 F.2d 561, 565 (6th Cir. 1986), affg. in part, revg. in part and remanding T.C. Memo. 1984-310; Bokum v. Commissioner, 94 T.C. 126, 138 (1990), affd. 992 F.2d 1132 (11th Cir. 1993). Petitioner's failure to satisfy any one of these elements would preclude "innocent spouse" relief. Purcell v. Commissioner, supra at 473. *330 For all the years in issue, the parties agree that petitioner meets the first two elements under section 6013(e), including the percentage requirement applicable to this case under section 6013(e)(4). We are called upon to determine whether: (1) Petitioner lacked actual and constructive knowledge of the understatements, and (2) it would be inequitable to hold her liable for the deficiencies. 1979 and 1980 Taxable Years
Actual and Constructive Knowledge
We conclude that petitioner did not have actual or constructive knowledge that the 1979 and 1980 Federal income tax returns each contained a substantial understatement of tax attributable to grossly erroneous items of Osborn. With respect to actual knowledge, petitioner did not review the 1979 return before signing it, and she never saw or signed the 1980 return. Petitioner also was not aware of Osborn's business dealings, and generally she was unaware of his finances. With respect to the issue of constructive knowledge, we apply the law of the Ninth Circuit. Sec. 7482(b)(1); Golsen v. Commissioner, 54 T.C. 742 (1970), affd. on another issue 445 F.2d 985 (10th Cir. 1971). *331 In the Ninth Circuit, mere knowledge of the transaction underlying an erroneous deduction case is not sufficient to give a spouse reason to know of a resulting substantial understatement. Guth v. Commissioner, supra at 444; Price v. Commissioner, 887 F.2d 959, 963 n.9 (9th Cir. 1989), revg. an Oral Opinion of this Court; see also Erdahl v. Commissioner, 930 F.2d 585 (8th Cir. 1991) (adopted Ninth Circuit view), revg. T.C. Memo. 1990-101; Hayman v. Commissioner, 992 F.2d 1256 (2d Cir. 1993), [12] affg. T.C. Memo. 1992-228. Rather, a taxpayer constructively knows about an understatement if, upon signing the joint return, a similarly situated, reasonably prudent taxpayer could be expected to know that the return contained a substantial understatement. Price v. Commissioner, supra at 965. Key factors to consider in making this determination include: (1) The claimed innocent spouse's level of education; (2) his or her involvement in the family's business and financial *332 affairs; (3) the presence of unusual or lavish expenditures; and (4) the culpable spouse's evasiveness and deceit concerning the family's finances. Id.
For the following four reasons, we conclude that petitioner did not have constructive knowledge of the underpayments for the 1979 or 1980 taxable years. First, petitioner lacked any business education, training, or experience. [13] *334 Second, petitioner was not permitted to participate in the *333 family's financial affairs. Among other things, she was: (1) Denied access to Osborn's office where the financial documents were stored, (2) allowed to see only the signature page of the pre-1980 tax returns, and (3) ridiculed by Osborn if she attempted to learn about his business. Petitioner also did not hold a joint bank account with Osborn, and her separate account was maintained by Osborn at a balance that never exceeded $ 250. [14] Third, petitioner did not enjoy (or notice) any unusual or lavish expenditures. Although respondent argues that petitioner's house, built in 1979, and its furniture are lavish expenditures that should have alerted her about the understatement, we disagree. The house remained sparsely furnished for about a year, and petitioner customarily clipped coupons and shopped at a discount store for her family's clothes. Fourth, Osborn concealed his tax motivation for investing in Mohave. Accord Guth v. Commissioner, 897 F.2d at 444 (husband led wife to believe he founded a church for religious reasons, rather than tax motivation).
*335 Respondent also argues that petitioner had a duty to inquire into the amounts shown on her joint Federal income tax returns. In particular, respondent claims, petitioner should have been "put on notice" by the size of the erroneous deductions. We disagree. While the taxpayer in Price was put on notice because of the size of the deduction ($ 90,000), vis-a-vis the total income reported (a little over $ 100,000), the Court explicitly stated that this was "considered in light of the fact that * * * [the taxpayer] knew of the existence of * * * [the investment] and its rather unusual nature". Price v. Commissioner, supra at 966 (emphasis added). In the instant case, by contrast, petitioner did not examine the 1979 or the 1980 Federal income tax returns. Thus, the size of the deductions claimed could not have alerted her that something was amiss. [15]
*336 Respondent further argues that petitioner may not establish her innocence by her failure to review the return she signed. She cites Shannon v. Commissioner, T.C. Memo. 1991-207, to support this proposition. Shannon is inapposite here; it involved a taxpayer who was the corporate bookkeeper and in a position to know of the unreported corporate distribution that resulted in unreported income. Id. The facts of this case are more akin to those of Estate of Brown v. Commissioner, T.C. Memo. 1988-297 (taxpayer entitled to relief where her husband told her little about the company's affairs, and she was forced to sign documents, such as their joint tax returns, without review). Petitioner was forced by Osborn to sign her pre-1980 joint Federal income tax returns without review, and, if petitioner had tried to look at the returns or question their contents, we believe that Osborn would not have complied with her intentions. [16]
*337 Equity of Holding Petitioner Liable
Having concluded that petitioner did not have actual or constructive knowledge of the 1979 and 1980 understatements, we must now determine whether it is inequitable to hold her liable for the related deficiency for these taxable years. See sec. 6013(e)(1)(D). This determination is based on the facts and circumstances of the case. Id.; Flynn v. Commissioner, 93 T.C. 355 (1989). Although no longer a specific statutory requirement, whether the claimed "innocent spouse" received a benefit is taken into account.[17]Flynn v. Commissioner, supra at 367; H. Rept. 98-432 (Part 2), at 1502 (1984). However, the finding of a significant benefit is not outcome-determinative; even if a significant benefit is realized, relief is available if it would nevertheless be inequitable to hold the claimed innocent spouse liable. Busse v. United States, 542 F.2d 421, 427 (7th Cir. 1976); Sanders v. United States, 509 F.2d 162, 170-171 (5th Cir. 1975). *338 Respondent claims that petitioner realized a significant benefit because the understatements preserved funds for distribution to petitioner in the divorce settlement. We disagree. Much of petitioner's award in the divorce decree consisted of property acquired prior to the taxable years in issue. [18] In addition, during the taxable years in issue, petitioner lived a modest lifestyle, directly received none of the proceeds from the 1979 and 1980 refund checks, was dependent upon Osborn for support, and received only ordinary support from him. Ordinary support is not a significant benefit. Terzian v. Commissioner, 72 T.C. 1164, 1172 (1979). Furthermore, although petitioner received some benefit from the 1979 and 1980 tax refunds which were sent to her and Osborn, such benefit did not exceed normal support. *339 Accordingly, under the facts and circumstances of this case, it would be inequitable to hold petitioner liable for the deficiencies in tax (including interest, penalties, and other amounts) for the 1979 and 1980 taxable years. Thus, petitioner is entitled to "innocent spouse" relief for these years because all four elements of section 6013(e) are met. 1981 Taxable Year
With respect to the 1981 taxable year, however, we conclude that petitioner was aware that the 1981 Federal income tax return contained substantial understatements at the time she signed it. Petitioner reviewed the return with her attorney, questioned its accuracy, and initially refused to sign it. Petitioner also attached a "disclaimer" to the 1981 return highlighting her knowledge of the income and deductions contained on the return. [19] *340 Accordingly, petitioner had actual knowledge of the 1981 understatements, and is not entitled to "innocent spouse" relief under section 6013(e). [20] See sec. 6013(e)(1)(C); see also Purcell v. Commissioner, 826 F.2d at 473 (petitioner's failure to satisfy any one of these elements precludes "innocent spouse" relief).
*341 For the foregoing reasons, Decision will be entered under Rule 155. Footnotes
1. For 1977, 1979, and 1980 the determination is under sec. 6653(a).↩
2. This amount will be 50 percent of the interest due on the portion of the deficiency attributable to negligence.↩
1. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. In her notice of deficiency, respondent disallowed various losses and deductions claimed by petitioner and Osborn for the 1977, 1979, 1980, and 1981 taxable years. In her petition, petitioner raised only two issues, namely, whether petitioner: (1) Filed for each year in issue a "joint return" within the meaning of sec. 6013(d)(3); and (2) is entitled to "innocent spouse" relief under sec. 6013(e) for all the years in issue. Petitioner conceded all other issues, and we do not consider them. Rule 34(b)(4); Jarvis v. Commissioner, 78 T.C. 646, 658 n.19 (1982); see also Merlino v. Commissioner, T.C. Memo. 1993-200. At trial, petitioner conceded the issue under sec. 6013(d)(3); she also presented no evidence on the 1977 taxable year. At the close of trial, respondent moved for decision in her favor with respect to the 1977 taxable year because of petitioner's failure to adduce any evidence on this year. We will grant respondent's motion. See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Without further discussion, we uphold respondent's determinations that: (1) For each year in issue, petitioner filed a joint return within the meaning of sec. 6013(d)(3), and (2)↩ petitioner is liable for the 1977 tax deficiency included in her notice of deficiency.
3. Osborn purchased a limited partnership interest in Mohave Minerals, Ltd.↩
4. Similarly, petitioner knew Osborn "bought embryo cows", an investment which is not at issue in this case. Again, however, petitioner merely was aware of their existence. Osborn had taken petitioner and their children to an auction for these embryos. While at the auction, Osborn ordered petitioner and the children not to speak to anyone, or make any sound or movement. At the conclusion of the auction, petitioner and the children waited by themselves while Osborn spoke to his business colleagues.↩
5. The land in Harris County was purchased prior to the divorce decree with money from the estate of Osborn's mother. Osborn previously placed the land in a third party's name to "hide it", but petitioner "discovered it".↩
6. With respect to the loss from Mohave, the parties jointly stipulated before trial that petitioner was entitled to $ 14,122 of this loss. The parties also stipulated that: (1) Petitioner is liable for a $ 1,864.83 addition to tax for 1979, under sec. 6653(a); and (2) $ 13,732.25 of the deficiency in petitioner's 1979 income tax was a substantial understatement attributable to tax-motivated transactions for purposes of computing the interest payable under sec. 6621(c).↩
7. The parties also stipulated that: (1) Petitioner is not liable for a 1977 addition to tax under sec. 6653(a), and (2) the deficiency in 1977 income tax was not a substantial underpayment attributable to tax-motivated transactions for purposes of computing the interest payable with respect to such amount under sec. 6621(c).↩
8. Petitioner has conceded the issue under sec. 6013(d), however. See supra↩ note 2.
9. The parties also stipulated that: (1) Petitioner is not liable for any addition to tax for the 1980 taxable year, and (2) the 1980 deficiency was not a substantial underpayment attributable to tax-motivated transactions for purposes of computing the interest payable under sec. 6621(c).↩
10. The parties also stipulated that: (1) Petitioner is liable for 1981 additions to tax equal to: (i) $ 2,053.25, under sec. 6653(a)(1), and (ii) 50 percent of the interest due on $ 4,114, under sec. 6653(a)(2); and (2) $ 34,400 of the deficiency in petitioner's 1981 tax was a substantial understatement attributable to tax-motivated transactions for purposes of computing the interest payable under sec. 6621(c).↩
11. In relevant part, sec. 6013(e) provides: (1) In General. -- Under regulations prescribed by the Secretary, if -- (A) a joint return has been made under this section for a taxable year, (B) on such return there is a substantial understatement of tax attributable to grossly erroneous items of one spouse, (C) the other spouse establishes that in signing the return he or she did not know, and had no reason to know, that there was such substantial understatement, and (D) taking into account all the facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such substantial understatement.
then the other spouse shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent such liability is attributable to such substantial understatement.
Prior to 1984, sec. 6013(e) allowed relief only from liability resulting from omissions of income. In 1984, however, the provision was expanded to provide relief from joint liability from erroneous deductions as well. Although the taxable years before us predate the 1984 amendment, we apply the current version of sec. 6013(e) because the 1984 amendment applies retroactively to our case. Deficit Reduction Act of 1984, Pub. L. 98-369, sec. 424(a), (c), 98 Stat. 494, 801, 803 (1984 amendment is effective as if included in the Internal Revenue Codes of 1939 and 1954); see also Bokum v. Commissioner, 94 T.C. 126, 138 n.13 (1990), affd. 992 F.2d 1132↩ (11th Cir. 1993).
12. In its first occasion to construe the lack of knowledge requirement of sec. 6013(e)(1)(C) with respect to disallowed deductions, the Court of Appeals for the Second Circuit adopted the standard articulated by the Court of Appeals for the Ninth Circuit in Price v. Commissioner, 887 F.2d 959 (9th Cir. 1989), revg. an Oral Opinion of this Court, and followed by the Court of Appeals for the Eighth Circuit in Erdahl v. Commissioner, 930 F.2d 585 (8th Cir. 1991), revg. T.C. Memo. 1990-101↩.
13. Petitioner held a bachelor of arts in history with a minor in education.↩
14. Cf. Price v. Commissioner, supra at 965 (wife had limited involvement in family finances despite responsibility of paying mortgage); Hinds v. Commissioner, T.C. Memo. 1988-426 ("innocent spouse" relief allowed for wife whose participation in family's financial affairs was limited to accepting money from husband to pay household expenses and purchase family's food and clothing). The instant case is distinguishable from Park v. Commissioner, T.C. Memo. 1993-252. In Park↩, this Court determined that the taxpayer had constructive knowledge of the substantial understatement because she had ready access to all documents sent to her husband regarding the investment that gave rise to the substantial understatement, and she read these documents and was aware of the investment. Further, she had knowledge of the family's finances and her husband's payments with respect to the investment; she had control of the family's checkbooks and paid most of the bills out of their joint checking account. She even wrote and mailed a check for the investment in issue.
15. Accord McRae v. Commissioner, T.C. Memo. 1988-374↩ ("innocent spouse" relief allowed where taxpayer did not have opportunity to question any item in the returns because returns were never given to taxpayer to sign).
16. We also note that, contrary to respondent's belief, failure to inspect a Federal income tax return does not automatically preclude innocent spouse relief. See, e.g., Terzian v. Commissioner, 72 T.C. 1164, 1171↩ (1979) ("the fact that * * * [taxpayer] signed the return without reading it does not require the conclusion that she had reason to know of the omitted income").
17. Prior to the 1984 amendment, the predecessor to sec. 6013(e)(1)(D)↩ specifically provided that this "inequity" element is to be determined by "taking into account whether or not the other spouse significantly benefited directly or indirectly from the items omitted".
18. Thus this case is distinguishable from Grubich v. Commissioner, T.C. Memo. 1993-194↩, where the items and property the taxpayer received in her divorce settlement were "purchased free and clear with the untaxed profits of the business" that gave rise to the understatements.
19. Contrary to petitioner's belief, such a statement attached to her 1981 Federal income tax return did not release her from joint liability with respect to that return. If petitioner wanted to protect herself from joint liability with respect to the 1981 taxable year, she could have filed a 1981 tax return using the filing status of "Married filing separate return".↩
20. We also note that, without regard to actual notice, petitioner had constructive knowledge of the understatements for the 1981 taxable year. When she reviewed the return with her attorney prior to signing it, petitioner understood it with his help. Petitioner was "shocked" when she saw the losses claimed on the 1981 joint return; although such shock raised the duty to inquire, she did not question either Osborn or his accountant regarding the claimed deductions and losses. Subjective suspicion of the deductions, if not inquired into, acts as a bar to relief. Guth v. Commissioner, 897 F.2d 441, 445 (9th Cir. 1990) (taxpayer's subjective awareness of something unusual about circumstances leading to the understatement triggers duty to inquire), affg. T.C. Memo. 1987-522. In addition, a spouse cannot harbor doubts about the accuracy of a return and then turn a blind eye to it. Stevens v. Commissioner, 872 F.2d 1499, 1507 (11th Cir. 1989), affg. T.C. Memo. 1988-63; Sanders v. United States, 509 F.2d 162, 169↩ (5th Cir. 1975).