MORTIMER WIMPIE, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Wimpie v. Commissioner
Docket Nos. 19057-91, 19510-91, 14222-92
United States Tax Court
T.C. Memo 1994-41; 1994 Tax Ct. Memo LEXIS 39; 67 T.C.M. (CCH) 2091; T.C.M. (RIA) 94041; January 31, 1994, Filed *39 R determined that H and W (Ps) were not "at risk" for the full amount deducted with respect to a computer leasing transaction and disallowed certain deductions; Ps contend that they were at risk. Ps further contend that W is entitled to relief from liability for the deficiencies and additions to tax for the years in which she filed a joint return with H pursuant to the "innocent spouse" provision of sec. 6013(e), I.R.C.
Held: Ps were not at risk within the meaning of sec. 465, I.R.C.Held further: W is not entitled to "innocent spouse" relief under sec. 6013(e), I.R.C.
For petitioners: Eli Robins. For respondent: Wendy S. Sands and Victoria J. Kankrek. LARO
LARO
MEMORANDUM FINDINGS OF FACT AND OPINION LARO, Judge: Mortimer Wimpie, individually in docket No. 19057-91, and jointly with Katrina Wimpie in docket Nos. 19510-91 and 14222-92, petitioned this Court for a redetermination of respondent's determinations reflected in her notices of deficiency. Hereinafter, the term "petitioners" refers to Mortimer Wimpie with respect to docket No. 19057-91, and to Mortimer Wimpie and Katrina Wimpie with respect to docket Nos. 19510-91 and 14222-92. Respondent determined deficiencies *40 in and additions to petitioners' Federal income tax as follows: Mortimer Wimpie
Addition to Tax
Year
Deficiency
Sec. 6661
1984
$ 63,464
$ 15,866
1985
95,454
23,864
Mortimer Wimpie and Katrina Wimpie
Addition to Tax
Year
Deficiency
Sec. 6661
1986
$ 55,020
$ 13,755
1987
29,938
7,485
1988
24,319
6,080
Respondent also determined that the underpayment of Federal income tax for all taxable years in issue was substantial and attributable to tax-motivated transactions within the meaning of section 6621(c). [2] Accordingly, respondent determined that the annual rate of interest payable on the entire underpayment for those years was 120 percent of the adjusted rate established under section 6621(b). After concessions, [3] the issues for decision are: (1) Whether petitioners' claimed *41 deductions related to a computer leasing activity are limited by section 465. We hold they are. (2) Whether Katrina Wimpie (Mrs. Wimpie) was an "innocent spouse" with respect to petitioners' 1986 through 1988 Federal income tax returns. We hold she was not. (3) Whether petitioners are liable for increased interest under section 6621(c). We hold they are. (4) Whether petitioners are liable for additions to tax under section 6661. [4] We hold they are. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The *42 stipulations and exhibits attached thereto are incorporated herein by this reference. Petitioners resided in New York State at the time they filed their petition. Mortimer Wimpie (Mr. Wimpie) filed his 1984 and 1985 Federal income tax returns under the filing status "Single". Petitioners married in September 1986 and filed their 1986 through 1988 returns under the filing status "Married filing joint return". Petitioners are still married. The Leasing Transactions
For each year in issue, petitioners claimed losses on Schedule C of their tax return, Profit or (Loss) From Business or Profession, for certain equipment leasing activity; [5] respondent disallowed the following amounts of these losses: Year
Amounts
1984
[6] $ 139,251 *43 1985
[7] 190,907
1986
102,191
1987
86,098
1988
59,759
The series of transactions generating these losses is described below. Storage Technology Leasing Corporation (STLC), a vendor of computer equipment, owned certain computer equipment that it had leased to lessees (the initial users) in 1983 and 1984. In August 1984, STLC obtained a loan from The Savers Leasing Corporation (Savers Leasing), giving Savers Leasing two nonrecourse promissory notes secured solely by the computer equipment. [8]
On December 31, 1984, the following occurred: (1) STLC sold the leased equipment to Trans Cap Associates I Limited Partnership (Transcap), a partnership formed on that date. [9] Transcap paid for the equipment with a downpayment and nonrecourse *44 promissory notes. [10] Transcap assigned to STLC, as security, the user leases and all rental payments and other sums to be paid by the initial users. These rental payments and other sums to be paid by the initial users were sufficient to service fully both the principal and interest due on the nonrecourse notes that Transcap gave to STLC. *45 (2) Transcap sold its interest in the equipment to Hawthorne Capital Corporation (HCC) in return for a nonrecourse or limited recourse promissory note. [11]
(3) HCC leased the equipment, subject to all liens and leases, back to Transcap. [12] Transcap assigned to HCC, in order to secure Transcap's performance as lessee, all of Transcap's rights under the leases on the equipment. Transcap also agreed to indemnify HCC and hold HCC harmless from all costs and expenses HCC might incur with respect to leasing the equipment. *46 (4) HCC sold the equipment, subject to all prior liens and leases, to a group of joint venturers consisting of Mr. Wimpie, William J. Aramony (Aramony), Jon E.M. Jacoby (Jacoby) and Richard Runco (collectively, the investor group). [13] *47 A document entitled Secured Note states that the investor group promises to pay HCC $ 2,520,435.50; [14] the interest rate on this amount is 14 percent. The Secured Note is expressly nonrecourse as to obligations other than principal payments. Payments totaling $ 33,750.28 plus interest were required from the investor group on each of January 15, 1985, and February 15, 1985. [15] Except for these payments, the principal amount of the Secured Note was due January 1, 1991. Under the Secured Note, the payments made by Transcap under the Master Lease as "Fixed Rent", as well as certain other payments, are treated as "mandatory prepayments". [16] Under the Secured Note, all prepayments are applied first to accrued and unpaid interest and then to principal. (5) A "Letter of Direction" directs Transcap to pay directly to HCC lease rental amounts that would be due to the investor group. The Letter of Direction further provides that all such payments shall constitute payments by the investor group to HCC. Mrs. Wimpie
Mrs. Wimpie completed intermediate school in England and achieved both ordinary and advanced academic levels. She received a bachelor's degree in economics and social statistics from Manchester University in England. Mrs. Wimpie received a master's degree in psychology from New York University in 1987 or 1988 and is currently completing a doctoral degree in clinical psychology at New York *48 University. After graduating from Manchester University, Mrs. Wimpie worked as an administrator in a factory for approximately 1 year. Later, she worked as a design documentation engineer at Marconi Space and Defense, a weapons systems manufacturer located outside London. Mrs. Wimpie then worked at PARC, a computer leasing company, from approximately July 1980 to May 1982. From June 1982 through January 1984, Mrs. Wimpie worked as a contracts administrator for Equilease, an equipment leasing company, first in Equilease's London office, and then in its Zurich office. Equilease's activity included buying leased equipment, selling that equipment, and leasing it back. Mrs. Wimpie assembled all documents necessary for each leasing contract. In February 1983, Mrs. Wimpie met Mr. Wimpie, who was a senior vice-president of Equilease. In January 1984, Mrs. Wimpie moved to New York and commenced residing with Mr. Wimpie. She obtained a work permit, and from June 1984 through June 1985 she worked as a contracts administrator at First Rock Financial (First Rock) in New York. First Rock sold tax shelters. Mrs. Wimpie's work there included systems design, data processing, and review *49 of documents. Richard Runco was one of Mrs. Wimpie's bosses at First Rock. At First Rock, Mrs. Wimpie met Jacoby and Donald G. Butler (Butler). Butler was executive vice-president of Transcapital Computer Corporation. Prior to her marriage to Mr. Wimpie, Mrs. Wimpie did not possess significant financial assets. During the years in issue, petitioners traveled extensively; their travel destinations included Puerto Rico, Santo Domingo, La Costa, Niagara Falls, and Great Britain. During each year in issue, petitioners owned a BMW. Mr. Wimpie paid the $ 10,000 annual tuition for Mrs. Wimpie's studies at New York University. Petitioners' Tax Returns
Mr. Wimpie did not prevent Mrs. Wimpie from reading their tax returns before signing them, and never instructed her not to read them. Petitioners reported total income of $ 164,845 on their 1986 Federal income tax return, and wrote 1986 checks of at least $ 168,231. Petitioners reported total income of $ 305,072 on their 1987 Federal income tax return, and wrote 1987 checks of at least $ 462,261. Petitioners reported total income of $ 50,041 on their 1988 Federal income tax return, and wrote 1988 checks of at least $ 330,689. *50 OPINION At Risk Amounts Under Section 465
Section 465 was enacted to limit abuses in tax shelters arising from the use of various limited risk financing techniques; it was intended to prevent taxpayers from deducting losses that exceed amounts "at risk" in the transaction. S. Rept. 94-938, 1976-3 C.B. (Vol. 3) at 85. The Senate Report criticizes nonrecourse financing "and other risk limiting devices" because if such devices produce tax losses in excess of amounts at risk, they substantially alter the economic substance of a transaction. Id. Thus, following the enactment of section 465, an individual taxpayer engaged in an activity to which section 465 applies may only deduct losses from the activity to the extent that the taxpayer is "at risk" with respect to the activity at the close of the taxable year. Sec. 465(a). An individual taxpayer generally is "at risk" with respect to amounts including "the amount of money and the adjusted basis of other property contributed by the taxpayer to the activity", sec. 465(b)(1), and with respect amounts borrowed for use in the activity to the extent the taxpayer is personally liable for repayment *51 of such amounts, or has pledged property, other than property used in the activity, as security for the borrowed amounts, sec. 465(b)(2). [17] Consistent with the legislative history of section 465, a taxpayer is never considered at risk "with respect to amounts protected against loss through nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements." Sec. 465(b)(4). Computer leasing is one of the activities to which section 465 applies. Secs. 465(c)(1)(C), 1245(a)(3). Respondent argues that the combination of the circular financing in the transaction in issue and the nonrecourse nature of the underlying debt renders this transaction a "similar arrangement" within the meaning of section 465(b)(4). Mr. Wimpie contends that no amounts were protected against risk by "similar arrangements", *52 and that he was at risk by virtue of his obligation to pay principal on his promissory note. Petitioners bear the burden of proof. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). As explained below, we agree with respondent. An arrangement that effectively immunizes investors from any realistic possibility of suffering an economic loss even if the underlying transaction is not profitable, falls within the scope of section 465(b)(4). Waters v. Commissioner, 978 F.2d 1310, 1316 (2d Cir. 1992) affg. T.C. Memo. 1991-462; Moser v. Commissioner, 914 F.2d 1040, 1048 (8th Cir. 1990) affg. T.C. Memo. 1989-142; American Principals Leasing Corp. v. United States, 904 F.2d 477, 483 (9th Cir. 1990); see also Martuccio v. Commissioner, T.C. Memo. 1992-311; cf. Emershaw v. Commissioner, 949 F.2d 841, 849 (6th Cir. 1991), affg. T.C. Memo. 1990-246. The instant case is appealable to the Court of Appeals for the Second *53 Circuit. Sec. 7482(b)(1)(A). In the Second Circuit, year-end economic reality is the touchstone of the analysis. [18]
Waters v. Commissioner, supra at 1317. The structure of the transaction in the instant case was such that the stream of payments was circular; Transcap owed HCC lease rent, but HCC owed Transcap for its purchase of the equipment. If Transcap stopped making lease payments, it could only expect a chain reaction, leaving offsetting claims among the parties; and if the users of the equipment stopped making lease payments, the lenders could only look to the equipment to recover their funds. In addition, the Letter of Direction eliminated the investor group from the loop; as payments were made by Transcap to HCC, these amounts were treated as if *54 they were paid by the investor group to HCC. Although a circular stream of payments is not enough, in and of itself, to constitute an arrangement under section 465(b)(4), it and other factors must be taken into account in determining whether the facts and circumstances of a case constitute such an arrangement. Wag-A-Bag, Inc. v. Commissioner, T.C. Memo. 1992-581. In conjunction with the circular nature of the payments, the terms of the Secured Note protected Mr. Wimpie from loss. Under the terms of the Secured Note, the amounts made by Transcap under the Master Lease were to be applied to the Secured Note first to accrued but unpaid interest and then to principal. Accordingly, by means of these payments, the principal balance of the Secured Note would be reduced; by 1991, the Secured Note would be fully discharged. [19] Thus, although Mr. Wimpie was nominally liable for principal on the Secured Note, the economic reality of the arrangement was that Mr. Wimpie would never have to pay any principal other than the $ 52,838 he paid up front. As a result, Mr. Wimpie was not at risk for any amount other than the $ 52,838. *55 The facts of Waters v. Commissioner, supra, are very similar to those of the instant case. In Waters, Equitable Financial Management, Inc. (Equitable) sold computer equipment to Cooper Leasing Corp. (Cooper), which simultaneously resold the property to two individuals, Waters and Moffatt; Waters and Moffatt simultaneously leased the equipment back to Equitable. Waters v. Commissioner, supra at 1312. Equitable's monthly rent payments matched the monthly note payments due from Waters and Moffatt to Cooper and the monthly note payments due from Cooper to Equitable. Id. In addition, Cooper and Equitable were owned by substantially the same interests. Id. The Court of Appeals held that the structure of the transaction was an arrangement protecting the taxpayer from economic loss. Id. at 1316. In so holding, the court noted that: (1) The circular nature of virtually identical payments protected Waters from economic loss; (2) the virtual identity in ownership and control of Equitable and Cooper rendered it unlikely that Equitable would stop making lease payments; (3) if Equitable did stop making *56 lease payments, it could only expect a chain reaction, leaving offsetting claims among the parties; [20] and (4) if the equipment user stopped making lease payments, because of the nonrecourse nature of the underlying bank debt, the banks could only look to the equipment to recover their funds. Id. at 1316-1317. In the case at bar, we apply a similar rationale and reach the same result as did our Court *57 and the Court of Appeals for the Second Circuit in Waters v. Commissioner, supra. First, as in Waters, the circular stream of payments protected Mr. Wimpie from liability; Transcap's payments would fully discharge the Secured Note by 1991. Second, because of this circular stream of payments, if Transcap or HCC ceased its payments, the parties to the transaction could only expect a chain reaction. Third, although Transcap and HCC are unrelated, the Letter of Direction provided that payments from Transcap to HCC would be treated as payments by the investor group. Fourth, as in Waters, the underlying bank debt is nonrecourse. Accordingly, the "year-end economic reality" for each of the years in issue is that Mr. Wimpie was not "at risk" within the meaning of section 465 for any of the amounts in issue. [21]
Innocent Spouse Protection Under Section 6013(e)
Spouses *58 generally are jointly and severally liable for income taxes due on a joint Federal income tax return. Sec. 6013(d)(3); Hayman v. Commissioner, 992 F.2d 1256, 1259 (2d Cir. 1993), affg. T.C. Memo. 1992-228; Osborn v. Commissioner, T.C. Memo. 1993-312. Prior to 1971, both spouses were strictly liable for tax deficiencies resulting from an erroneous omission or deduction solely attributable to one spouse, although the other spouse was "innocent". Guth v. Commissioner, 897 F.2d 441, 442-443 (9th Cir. 1990), affg. T.C. Memo. 1987-522. In 1971, Congress remedied this inequity by enacting an "innocent spouse" provision to protect one spouse from the overreaching or dishonesty of the other. Osborn v. Commissioner, supra.
The "innocent spouse" provision of section 6013(e)[22] relieves a spouse of joint Federal income tax liability if each of the following four elements are met: (1) A joint Federal income tax return was filed by the spouses; (2) there is a substantial understatement of tax attributable to *59 grossly erroneous items of the other spouse; (3) in signing the return, the claimed "innocent spouse" did not know, and had no reason to know, of the substantial understatement; and (4) taking into account all the facts and circumstances, it would be inequitable to hold the claimed "innocent spouse" liable for the deficiency attributable to the understatement. Sec. 6013(e)(1). Petitioners bear the burden of proving that each of these elements is satisfied. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933); Shea v. Commissioner, 780 F.2d 561, 565 (6th Cir. 1986), affg. in part, revg. in part, and remanding T.C. Memo. 1984-310; Bokum v. Commissioner, 94 T.C. 126, 138 (1990), affd. 992 F.2d 1132 (11th Cir. 1993). Petitioners' failure to satisfy any one of these elements precludes "innocent spouse" relief for Mrs. Wimpie. Bokum v. Commissioner, supra at 138. *60 Petitioners filed joint returns for 1986, 1987, and 1988. We must determine whether: (1) There was a substantial understatement of tax attributable to grossly erroneous items of Mr. Wimpie; (2) Mrs. Wimpie lacked actual and constructive knowledge of the understatements; and (3) it would be inequitable to hold her liable for the deficiencies. A substantial understatement means any understatement exceeding $ 500; in deduction cases the tax liability must also exceed a stated percentage of the innocent spouse's adjusted gross income for the "preadjustment year". Sec. 6013(e)(3) and (4). The "preadjustment year" is the most recent taxable year of the spouse ending before the notice of deficiency was mailed. Sec. 6013(e)(4)(C). Mrs. Wimpie's preadjustment year for her 1986 and 1987 taxable years is the 1990 taxable year because the notice of deficiency for such years was mailed on May 30, 1991. Mrs. Wimpie's preadjustment year for her 1988 taxable year is the 1991 taxable year because the notice of deficiency for petitioners' 1988 taxable year was mailed April 2, 1992. Petitioners have not presented any evidence on Mrs. Wimpie's 1990 or 1991 income. Thus, we are unable to determine *61 whether petitioners have satisfied section 6013(e)(1)(B). Because petitioners bear the burden of proof, their failure to present any evidence on this issue precludes innocent spouse relief for Mrs. Wimpie. We also note that even if petitioners had presented evidence of Mrs. Wimpie's preadjustment year gross income, we would not find that Mrs. Wimpie was an innocent spouse. First, petitioners did not establish that the understatement was attributable to grossly erroneous items of Mr. Wimpie. [23]
*62 Second, Mrs. Wimpie had reason to know the contents of petitioners' tax returns, even if she did not have actual knowledge of their contents. In the Second Circuit, in order for a taxpayer to be accorded innocent spouse relief, the taxpayer must establish that he or she "did not know and did not have reason to know that the deduction would give rise to a substantial understatement." [24]Hayman v. Commissioner, 992 F.2d 1256, 1261 (2d Cir. 1993) (quoting Price v. Commissioner, 887 F.2d 959, 963 (9th Cir. 1989)), affg. T.C. Memo. 1992-228. This requires us to determine whether a reasonably prudent taxpayer in Mrs. Wimpie's position at the time she signed the returns could be expected to know that the returns contained substantial understatements. Hayman v. Commissioner, supra, at 1261. We must consider the following factors in making this determination: (1) Mrs. Wimpie's level of education; (2) her involvement in the family's business and financial affairs; (3) expenditures that appear lavish or unusual in comparison to the family's past level of income, standard *63 of living, and spending patterns, and (4) Mr. Wimpie's level of deceit or evasiveness. Id. Applying these factors, we find that Mrs. Wimpie should have known that the returns she signed contained substantial understatements. Mrs. Wimpie is an intelligent, educated woman who had many years of practical experience in the computer leasing industry. She knew that her husband worked in the industry as well. In addition, the fact that petitioners' checkbook payments exceeded their reported income should have prompted her to inquire about the losses. See id. at 1262. Furthermore, Mr. Wimpie did not prevent her from reading their tax returns or questioning him about their contents. Thus, even if Mrs. Wimpie signed the returns without reading them, she is charged with constructive knowledge of their contents. Id. at 1261. *64 Third, it is not inequitable to hold Mrs. Wimpie liable for the deficiency because Mrs. Wimpie benefited from the deductions. See id. (whether the claimed "innocent spouse" received a significant benefit is taken into account); Flynn v. Commissioner, 93 T.C. 355, 367 (1989) (same); H. Rept. 98-432 (Part 2), at 1502 (1984). During the years in issue, petitioners traveled to Puerto Rico, Santo Domingo, La Costa, Niagara Falls, and Great Britain; petitioners drove a BMW; and Mr. Wimpie paid the $ 10,000 annual tuition for Mrs. Wimpie to obtain a Ph.D. in psychology. In addition, petitioners are still married; the instant case is not one where petitioners divorced subsequent to the years in issue and Mrs. Wimpie was left to "'face the music' alone". See Hayman v. Commissioner, supra at 1263. Additions to Tax
Respondent determined that petitioners are liable for additions to tax under section 6661 for all years in issue. Section 6661 provides for an addition to tax if there is a substantial understatement of income tax. The amount of an addition to tax assessed after October 21, 1986, is equal to 25 percent *65 of the amount attributable to the substantial understatement. Omnibus Budget Reconciliation Act of 1986, Pub. L. 99-509, sec. 8002, 100 Stat. 1951. An understatement is substantial if it exceeds the greater of 10 percent of the tax required to be shown on the return or $ 5,000. Sec. 6661(b)(1)(A). An understatement is reduced to the extent it is: (1) Based on substantial authority, or (2) adequately disclosed in the return or in a statement attached to the return. Sec. 6661(b)(2). Respondent further determined that the understatements for petitioners' 1984, 1985, 1986, and 1987 taxable years were attributable to a plan or arrangement the principal purpose of which was to avoid or evade Federal income tax. Such an understatement is reduced to the extent it is based on substantial authority and petitioners reasonably believed that their tax treatment was more likely than not the proper tax treatment. Sec. 6661(b)(2)(C)(i). On the facts of this case, petitioners should be relieved of liability under section 6661. See Waters v. Commissioner, T.C. Memo. 1991-462, affd. 978 F.2d 1310 (2d Cir. 1992); Wag-A-Bag, Inc. v. Commissioner, T.C. Memo. 1992-581. *66 We are satisfied that there was sufficient authority supporting petitioners' position to constitute substantial authority, see, e.g., Emershaw v. Commissioner, 949 F.2d 841 (6th Cir. 1991), affg. T.C. Memo. 1990-246; Levy v. Commissioner, 91 T.C. 838 (1988), and that petitioners reasonably believed that their tax treatment was more likely than not the proper tax treatment. With respect to increased interest under section 6621(c), we are compelled to sustain respondent's determination; petitioners' underpayment of tax is in excess of $ 1,000 and petitioners were not at risk within the meaning of section 465 for the amounts in issue. Sec. 6621(c)(3)(A)(ii); Larsen v. Commissioner, 89 T.C. 1229, 1279 (1987), affd. in part and revd. in part on other issues sub nom. Casebeer v. Commissioner, 909 F.2d 1360 (9th Cir. 1990). We have considered the parties' other arguments and find them to be without merit. For the foregoing reasons, Decision will be entered for respondent in docket No. 19057-91. Decisions will be entered under *67 Rule 155 in docket Nos. 19510-91 and 14222-92. Footnotes
1. Cases of the following petitioners are consolidated herewith: Mortimer Wimpie and Katrina Wimpie, docket Nos. 19510-91 and 14222-92.↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
3. Respondent concedes certain adjustments to petitioners' claimed depreciation on a mainframe computer for petitioners' 1986, 1987, and 1988 taxable years. For 1984, respondent disallowed an investment credit that petitioners did not assign as an error in their petition; petitioners are deemed to have conceded this issue. Rule 34(b)(4).↩
4. For the 1988 taxable year, a computational adjustment in the amount of $ 5,311 to petitioners' claimed itemized deductions is also in issue.↩
5. Petitioners claimed losses for such equipment leasing activity in the following amounts: ↩
Year
Amounts
1984
$ 155,102
1985
227,894
1986
102,191
1987
86,098
1988
59,759
6. For 1984, respondent disallowed all but $ 15,851 in cash Mortimer Wimpie (Mr. Wimpie) paid in connection with the activity on Dec. 31, 1984.↩
7. For 1985, respondent disallowed all but $ 36,987 in cash Mr. Wimpie paid in connection with the activity pursuant to the terms of a "Secured Note" given by Mr. Wimpie and three other investors to Hawthorne Capital Corporation.↩
8. The principal amounts of the two promissory notes were $ 570,745.13 and $ 818,982.89, respectively.↩
9. The general partner of Trans Cap Associates I Limited Partnership (Transcap) was Transcapital Computer Corporation. Transcap's limited partner was L and S Leasing.↩
10. The principal amounts of these notes, labeled as follows, are listed below: Nonrecourse Promissory Note
Amount Republic 1
$ 140,062.12
Republic 2
20,159.00
Metromail
243,284.52
MW #2
259,820.82
MW #3
259,820.82
Owens C #2
246,748.54
Owens C #3
36,167.41
TRT #1
112,355.00
On Dec. 27, 1985, Transcap refinanced the equipment with a nonrecourse loan from The Savers Leasing Corporation (Savers Leasing). After the refinancing, the equipment users made their payments directly to Savers Leasing.↩
11. Neither the document of sale nor the promissory note is part of the record.↩
12. HCC leased the equipment back to Transcap pursuant to the Master Lease Agreement (the Master Lease). The Master Lease provides that to the extent any of the proceeds from the leases are used to satisfy any obligation relating to the lien on the equipment of the lender or the manufacturer, HCC receives a credit against its liability to Transcap. The Master Lease further provides that HCC would be liable on its debt to Transcap only to the extent HCC actually derived proceeds from the leases.↩
13. Mr. Wimpie did not sign the sales agreement; in place of his signature and those of Jon E.M. Jacoby and William J. Aramony is the notation "by Richard Runco AIF". There is no evidence in the record that Richard Runco was Mr. Wimpie's representative or attorney-in-fact.↩
14. The copy of the Secured Note in the record is unsigned. Under the Secured Note, Mr. Wimpie is liable for $ 1,018,160.58 of the principal amount.↩
15. Mr. Wimpie's share of each of these payments was $ 18,493.30.↩
16. For each of the years 1985, 1986, 1987, 1988, and 1990, the "Fixed Rent" under the Master Lease was set at $ 630,791, and was payable the following Jan. 1. The termination date of the Master Lease was Dec. 31, 1990.↩
17. Where the taxpayer has pledged property as security for borrowed amounts, the taxpayer is only at risk to the extent of the net fair market value of the taxpayer's interest in such property. Sec. 465(b)(2)↩.
18. We do not consider the "worst-case scenario" in applying sec. 465(b)(4). Waters v. Commissioner, 978 F.2d 1310, 1317 (2d Cir. 1992), affg. T.C. Memo. 1991-462↩.
19. The initial principal amount of the Secured Note was $ 2,520,435.50. By Feb. 15, 1985, the investor group should have paid $ 67,500.56. Thus, the outstanding principal balance on that date would be $ 2,452,934.94. With interest computed at 14 percent annually, the Fixed Rent payments of $ 630,791 would be applied to principal and interest, and principal would decline, as follows: ↩
Amount Applied
Amount Applied
Year
Loan Principal
to Interest to Principal
1985
$ 2,452,934.94
$ 343,410.89
$ 287,379.11
1986
2,165,555.83
303,177.82
327,613.16
1987
1,837,942.67
257,311.97
373,479.03
1988
1,464,463.65
205,024.91
425,766.09
1989
1,038,697.56
145,417.66
485,372.34
1990
553,325.22
77,465.53
553,325.47
1991
-0-
20. The court in Waters v. Commissioner, 978 F.2d 1310, 1316-1317 (2d Cir. 1992) stated: if Equitable stopped making payments on its lease, it could only have expected a chain reaction resulting in Waters and Moffatt, and then Coopers Leasing, ceasing to make payments as well. Any ensuing litigation would similarly have resulted in a chain reaction. Whether or not a litigant would have been entitled to setoff in a particular court action, it is clear that once the dust settled, the claims among the participants would have cancelled each other out.↩
21. We also note that petitioners have presented no evidence that Mr. Wimpie signed either the sales agreement or the Secured Note.↩
22. In relevant part, sec. 6013(e) provides: (1) In General. -- Under regulations prescribed by the Secretary, if -- (A) a joint return has been made under this section for a taxable year, (B) on such return there is a substantial understatement of tax attributable to grossly erroneous items of one spouse, (C) the other spouse establishes that in signing the return he or she did not know, and had no reason to know, that there was such substantial understatement, and (D) taking into account all the facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such substantial understatement,
then the other spouse shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent such liability is attributable to such substantial understatement.
Prior to 1984, sec. 6013(e) allowed relief only from liability resulting from omissions of income. In 1984, however, the provision was expanded to provide relief retroactively from joint liability arising from erroneous deductions as well. Deficit Reduction Act of 1984, Pub. L. 98-369, sec. 424(a), (c), 98 Stat. 494, 801, 803 (1984 amendment is effective as if included in the Internal Revenue Codes of 1939 and 1954); see also Bokum v. Commissioner, 94 T.C. 126, 138 n.13 (1990), affd. 992 F.2d 1132↩ (11th Cir. 1993).
23. A grossly erroneous item includes a deduction for which there is no basis in fact or law. Sec. 6013(e)(2)(B). Ordinarily, such a deduction can be characterized as fraudulent, frivolous, or phony. Douglas v. Commissioner, 86 T.C. 758, 762 (1986), affd. by unpublished opinion (10th Cir. 1989). But cf. Ness v. Commissioner, 954 F.2d 1495, 1498 (9th Cir. 1992) (deduction disallowed by sec. 465 is grossly erroneous item), revg. 94 T.C. 784↩ (1990).
24. For this purpose, we are assuming that petitioners' 1986, 1987, and 1988 Federal income tax returns contained substantial understatements, as required by sec. 6013(e)(1)(B)↩.