ARNOLD AND JUDITH BERGER, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Berger v. Commissioner
Docket Nos. 19149-90, 19150-90, 19157-90, 19269-90, 6164-91, 6165-91, 18516-91, 16893-92, 16894-92, 16895-92, 16896-92
United States Tax Court
T.C. Memo 1994-298; 1994 Tax Ct. Memo LEXIS 303; 67 T.C.M. (CCH) 3144; June 28, 1994, Filed *303 Decision will be entered under Rule 155. For petitioners: Theodore F. Brill. For respondent: James Kearney and Kathleen Whatley. SCOTT
SCOTT
MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in and additions to petitioners' Federal income tax in the amounts and for the years as follows: Arnold Berger and Judith Berger Docket Nos. 19149-90, 6165-91, 16893-92: Additional
Additions
Interest
to Tax Year
Deficiency Sec. 6621
Sec. 6661
1980
$ 21,321.20
--
-- 1981
207,188.16
--
-- 1982
259,171.45
--
$ 64,792.86
1983
21,481.00
[1]
5,370.00
1986
33,004.00
[1]
8,251.00
1987
44,813.00
[1]
11,203.00
Irving Berger Docket No. 19150-90: Additional
Additions
Interest
to Tax Year
Deficiency Sec. 6621
Sec. 6661 1980
$ 25,566.80
--
-- 1981
230,601.44
--
-- 1982
324,541.24
--
$ 81,135.31
Robert Kramer and Janet Kramer Docket Nos. 19157-90, 6164-91, 16896-92: Additional
Additions
Interest
to Tax
Year
Deficiency Sec. 6621
Sec. 6661
1980
$ 17,448.60
--
-- 1981
237,371.80
--
-- 1982
268,473.50
--
$ 67,118.38
1983
19,695.00
[1]
-- 1986
35,346.00
[1]
9,336.00
1987
3,971.00
[1]
1,915.00
*304 Jack Berger and Rose Berger Docket No. 19269-90: Additional
Additions
Interest
to Tax
Year
Deficiency Sec. 6621
Sec. 6661
1981
$ 266,292.40
--
-- 1982
348,969.00
--
$ 87,242.25
Irving Berger and Estate of Rose Berger Docket No. 16894-92: Additional
Additions
Interest
to Tax
Year
Deficiency Sec. 6621
Sec. 6661
1986
$ 68,581
[1]
$ 17,226
Rose Berger, Individually, and as Surviving Spouse of Jack Berger, and Arnold Berger, as Personal Representative of the Estate of Jack Berger, Deceased Docket No. 16895-92: Additional
Additions
Interest
to Tax
Year
Deficiency Sec. 6621
Sec. 6661
1986
$ 44,409
[1]
$ 11,102
1987
2,105
[1]
-- Respondent in her notices of final S corporation administrative adjustment sent to Echo Glen Villas, Inc., determined adjustments to the income of Echo Glen Villas, Inc., a subchapter S corporation, in the amounts and for the years as follows: Echo Glen Villas, Inc., Jack Berger, A Person Other Than The Tax Matters Person Docket No. 18516-91: Year
Total Adjustments 1983
$ 1,586,476
1984
1,393,730
1985
1,493,626 *305 All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated. The issues for decision are: (1) Whether the notices of final S corporation administrative adjustment issued to Echo Glen Villas, Inc. (Echo Glen), were invalid for the years 1983 and 1984 because Echo Glen, a subchapter S corporation, had only four stockholders. Respondent in the settled issues conceded that the statute of limitations barred the sending of a notice of final S corporation administrative adjustment to Echo Glen for the year 1985 on the date the notice was sent; (2) whether petitioners were at risk within the meaning of section 465 with respect to either the promissory notes given in purchase of certain computer equipment or the installment notes given in connection with such purchase or both and, if so, the extent to which they were at risk; and (3) whether respondent properly determined additions to tax with respect to the individual petitioners under section 6661 and interest on a substantial underpayment under section 6621(c) for certain of the years here in issue. *306 FINDINGS OF FACT Some of the facts have been stipulated, and these stipulated facts, including the exhibits attached to the stipulation, are found accordingly. At all times pertinent to these consolidated cases all the individual petitioners were residents of Florida. Petitioners Arnold Berger and Judith Berger, husband and wife, filed a joint Federal income tax return with the Internal Revenue Service Center in Atlanta, Georgia, for each of the years 1980, 1981, 1982, 1983, 1986, and 1987. Petitioners Robert Kramer and Janet Kramer, husband and wife, filed their joint Federal income tax returns for the years 1980, 1981, 1982, 1983, 1986, and 1987 with the Internal Revenue Service Center in Atlanta, Georgia. Petitioners Irving Berger and Rose Berger, husband and wife, filed their joint Federal income tax returns with the Internal Revenue Service Center in Atlanta, Georgia, for the years 1980, 1981, 1982, and 1986. Petitioners Jack Berger and Rose Berger, husband and wife, filed their joint Federal income tax returns with the Internal Revenue Service Center in Atlanta, Georgia, for the years 1981, 1982, 1986, and 1987. Echo Glen is a subchapter S Florida corporation incorporated *307 on July 30, 1981. From the date of its incorporation throughout all the period here involved it had its principal place of business in Dade or Broward County, Florida. Echo Glen maintained its books and records and filed its Forms 1120S income tax returns on an accrual method of accounting at all times here pertinent. It filed its Forms 1120S Federal income tax returns for the years 1983, 1984, and 1985 with the Internal Revenue Service Center in Atlanta, Georgia. At all times here pertinent Jack Berger, who died on July 4, 1992, Irving Berger, Robert Kramer, and Arnold Berger were the shareholders and the only shareholders of Echo Glen. On or about September 30, 1982, Echo Glen purchased certain computer equipment from St. Joseph Equity Corp. The transaction whereby Echo Glen purchased this equipment was substantially similar to numerous other transactions entered into between St. Joseph Equity Corp. and various investors through that corporation in computer equipment. St. Joseph Equity Corp. and St. Joseph Leasing Corp. were subsidiaries of St. Joseph Lease Capital Corp., which was a holding company 51 percent of the stock of which was owned until sometime in 1984 by the *308 holding company of St. Joseph Bank & Trust Co. and 49 percent of the stock of which was owned until 1984 by Mr. Michael Jennings. In 1984, the shares of St. Joseph Lease Capital Corp. owned by the holding company of St. Joseph Bank & Trust Co. were redeemed, and thereafter Michael Jennings was the sole owner of St. Joseph Lease Capital Corp. Transactions involving the purchase and lease of computers entered into by St. Joseph Equity Corp. (Equity) were in general arranged in the following manner. St. Joseph Leasing Corp. (Leasing) would locate and arrange to acquire computer equipment for lease to end-users. After the lessee had been identified and the purchase of the equipment arranged, Leasing would borrow, through St. Joseph Bank & Trust Co. (St. Joseph Bank) as agent, an amount to pay for the computer equipment after an agreed amount of downpayment had been made. At the time the computer equipment was bought the lease to the end-user had been arranged. A cash downpayment was made on the computer equipment, and the balance of the sales price was borrowed from various banks through St. Joseph Bank as agent. The loan for purchase of the equipment would be evidenced by a promissory *309 note that was nonrecourse as to Leasing, except that the lease which Leasing had negotiated with the end-user and the equipment would be assigned to St. Joseph Bank as agent as security for the promissory note. These notes contained a provision that the payments on the note were to be made from the rental receipts from the leases. After Leasing had the lease in place and had arranged for the money to be borrowed, it would sell both the equipment and the lease to Equity for a stated cash downpayment, which was in excess of the cash downpayment made by Leasing, with the balance to be paid by the seller borrowing the amount upon receipt from the buyer of a reassignment to Leasing of the equipment and the lease thereon. Equity would then locate purchasers (investors) for certain specific computer equipment which was already on lease and sell the equipment to such investors, subject to the prior leases and liens thereon, and would then lease back the equipment from the purchaser for a stated monthly rental. The price for the equipment would be paid by the investor with a cash downpayment or either a partial cash downpayment and a recourse promissory note for the balance of the downpayment *310 and a nonrecourse installment note for the remaining purchase price secured by the equipment and the lease on the equipment. In most instances, after approximately 1 year an amendment would be made to the nonrecourse installment note to state that a portion of the installment note had become recourse. This would be done in an effort to meet the at-risk provisions of section 465 for years after the amount at risk on the initial downpayment and recourse promissory note had been exhausted. There would be certain minor differences in the various transactions that Leasing and Equity arranged, but in substance they all followed the same pattern. The particular transactions here involved were with respect to certain computer equipment leased to Southern Pacific Transportation Co. (Southern Pacific) and Southern Bell Telephone & Telegraph Co. (Southern Bell) as end-users. The transactions here involved were arranged as purchases from Equity by Echo Glen, a subchapter S corporation, of computer equipment leased to Southern Pacific and Southern Bell for a total price of $ 12 million. The Southern Pacific and Southern Bell transactions have separate agreements, but were evidenced by identical *311 agreements. Of the $ 12 million purchase price, $ 2 million was paid in cash or recourse promissory notes of Echo Glen for which, as required by Equity, substitution promissory notes of each of the four stockholders of Echo Glen totaling the amount of the recourse note of Echo Glen were accepted by Equity as substitutes for Echo Glen notes. The Echo Glen recourse promissory notes were returned to Echo Glen, and the substitute notes of the shareholders were assigned by Equity to certain banks as collateral for loans to proceed with other transactions. These substitute recourse promissory notes were paid in full by petitioners. The balances of the purchase prices were paid with nonrecourse installment notes of Echo Glen totaling $ 10 million. These notes were payable only from the rental receipts from the leases on the equipment and secured by those leases and the equipment. When Echo Glen was incorporated, its shareholders intended for it to acquire certain land for development. However, this project fell through, and prior to the entry into the transactions here involved Echo Glen had no business operations. The total capital contributed by the stockholders at its incorporation *312 was $ 500, and no further cash contributions were made by the shareholders. The balance sheet of Echo Glen contained in its Federal income tax return for 1982, Form 1120S, showed total assets at the beginning of the year of $ 500, a shareholder's equity of $ 500, and a yearend value of assets of $ 10,244,726, consisting of $ 10,200,000 of computer equipment, which was determined by showing as the cost of the equipment $ 12 million, less depreciation of $ 1,800,000, resulting in the $ 10,200,000 value for the asset. The only other asset shown was $ 43,692 as an amount "due from affiliates". The balance sheet in its 1983 Federal income tax return showed assets at the beginning of the year the same as of the end of 1982, and for the end of the year showed assets of $ 7,560,000 for computer equipment, an amount of $ 4,440,000 of accumulated depreciation having been subtracted from the $ 12 million cost, and other assets of $ 344,793 composed of $ 317,293 as "due from affiliates" and $ 27,500 loans receivable. Capital stock was shown as $ 500 at both the beginning and end of the year 1983. On its 1984 return the beginning assets were shown to be the same as the closing assets on the *313 1983 return, and the assets at the end of the year 1984 were shown as computer equipment of $ 5,040,000 and other assets of $ 35,810, which consisted of "due from affiliates" $ 8,310 and loans receivable of $ 27,500. On its tax return for 1985 the balance sheet of Echo Glen showed the beginning assets the same as the assets at the end of 1984, and the assets at the end of 1985 were shown as $ 2,520,000 for computer equipment and other assets of $ 32,909, consisting of "due from affiliates" $ 5,409 and loans receivable of $ 27,500. Capital stock again was shown as $ 500. Mr. Michael Jennings was the president of both Leasing and Equity. The computer equipment ultimately sold to Echo Glen was purchased by Leasing. A part of it was leased by Leasing to Southern Pacific Transportation Co. of San Francisco, California (Southern Pacific), by a master lease entered into on May 30, 1980, and the balance was leased to Southern Bell Telephone & Telegraph Co. of Atlanta, Georgia (Southern Bell), under a master lease entered into on March 3, 1981. Both of these master leases had attached to them various schedules of equipment that was actually to be supplied to the lessees on various dates. *314 The documents in addition to the schedules of equipment had attached thereto various special provisions such as cancellation options and renewal options. Most of these documents as well as numerous documents entered into for the remaining transactions are stipulated exhibits in the record, and their provisions will only be recited in our findings to the extent necessary to decide the issues in these consolidated cases since they have been found as facts in finding the stipulation together with the exhibits as facts in the case. The Southern Pacific lease was master lease No. 100713-1 of Leasing, and the Southern Bell lease was lease No. 100727-1 of Leasing. As either Southern Bell or Southern Pacific needed equipment from the schedule attached to the master lease to be delivered and installed, Leasing in accordance with arrangements previously made would purchase the equipment and would make a downpayment on the equipment and give to St. Joseph Bank, as agent for specific banks which were the actual lenders, a promissory note for the remainder of the price. Each of these notes contained a provision that Anything herein to the contrary notwithstanding, this Note is a non-recourse *315 obligation of the Company [Leasing] and liability of the Company to make payments of principal and interest on this Note is limited solely to payments out of the rents under the aforesaid Master Lease Agreement, Security Agreement, and the proceeds of the Equipment held as security thereunder, and no holder of this Note shall have recourse to the Company or to any assets of the Company in the event that such rents, collateral and proceeds shall not be sufficient to fully discharge the liability of the Company hereunder. Payee agrees that, notwithstanding anything to the contrary contained herein: (a) the Company's obligations contained herein and in the Agency Agreement between the Company and the Payee (hereinafter collectively referred to as the "Obligations") shall be satisfied solely out of the rentals and other sums payable under the Master Lease Agreement or any other lease of the Equipment, or any other use or sale of such collateral, and (b) the Payee shall have no right to satisfy any of the Company's Obligations out of any other property of the Company, provided that nothing shall prevent the Payee from exercising the Payee's right with respect to such collateral in the *316 event of nonpayment of the Obligations.
In each instance in addition to the notes there were security agreements with respect to the collateral. The purchase agreements between Equity as seller and Echo Glen as buyer for the equipment that Leasing had on lease to Southern Bell and that it had on lease to Southern Pacific were each dated September 30, 1982, and each bill of sale of the equipment was also dated September 30, 1982. Each of these purchase agreements had provisions with respect to the re-leasing or sale of the equipment by or on behalf of Echo Glen at the conclusion of the lease. The two installment notes of Echo Glen dated September 30, 1982, totaling $ 10 million each contained among others the following provision: Seller agrees, for itself and its successors and assigns and any holder hereof, that notwithstanding anything to the contrary contained herein (a) the Buyer's Obligations shall be satisfied solely out of the rentals and other sums payable under any lease of the Equipment securing this Installment Note, or any other use or sale of the Collateral, and (b) the Seller shall have no right to satisfy any of the Buyer's Obligations out of any other property *317 of the Buyer, provided that nothing shall prevent the Seller from exercising its rights with respect to the Collateral in the event of nonpayment of the Obligations.
On the same date as the sales agreements, the promissory notes, and the installment notes were signed, Equity and Echo Glen entered into a lease agreement whereby Equity leased from Echo Glen the equipment on lease to Southern Bell and Southern Pacific. Echo Glen also signed under date of September 30, 1982, an agreement as to the sale being subject to leases, liens, encumbrances, and assignments previously made with respect to the equipment. Also a security agreement with respect to the equipment was signed by Echo Glen securing Equity. The leases with Equity as lessee and Echo Glen as lessor contained numerous provisions, among which was the following: Lessor and Lessee mutually agree for themselves, their successors and assigns, heirs, executors and administrators, that: (a) Lessee's obligations for the payment of rent or other sums under the Lease shall be satisfied solely out of the rentals and other sums payable under the present or subsequent subleasing of the Equipment; and (b) none of the Lessee's *318 obligations under the Lease shall be satisfied out of other property of the Lessee.
Under date of September 30, 1982, a purchase agreement with Leasing as seller and Equity as buyer was entered into between Leasing and Equity with respect to the Southern Bell equipment which Equity had entered into an agreement to sell to Echo Glen, and a similar agreement was entered into between Leasing and Equity with respect to the Southern Pacific equipment that Equity had entered into an agreement to sell to Echo Glen. Among other things this agreement provided that the purchase price of the equipment should be payable on the commencement date of the original term of the master lease by a specified amount of cash and the balance by an amount representing the present value, utilizing a fifteen percent (15%) discount rate, of all remaining rentals and other sums due during the Original Term of the Master Lease which sum will be borrowed by the Seller, and will accordingly be deemed to be paid by the Buyer, upon receipt from the Buyer of: (i) A re-assignment to the Seller of the Master Lease; and (ii) an assignment of a senior security interest in the Equipment during the Original Term *319 of such Master Lease in order to guarantee the performance under said Master Lease by the Lessee thereunder.
The various security agreements and assignments referred to in the purchase agreement with Leasing as seller and Equity as buyer were executed by Equity as security to Leasing. During the course of negotiations between Mr. Jennings and representatives of Echo Glen, primarily Mr. Arnold Berger and Mr. Kramer and their accountant representatives, Mr. Jennings sent a document which he entitled Equipment Leasing Investment Projected Profit and Loss Statement to Echo Glen and its representatives. This statement showed the end-users as Southern Bell and Southern Pacific, the owners as Echo Glen, and the equipment as electronic data processing equipment, with a purchase price of $ 12 million, a nonrecourse installment note of $ 10 million, and equity investment of $ 2 million. It showed the rental income, which was the amount which was the stated rental to be paid by Equity in the lease from Echo Glen to Equity, interest expense, depreciation, pretax income or loss, tax savings, cash-flow, and after-tax cash flow with respect to the transactions. Various notes explained *320 the projection. Note 1 showed total rentals payable by Equity to Echo Glen of $ 185,086.83 per month for 96 months in advance commencing January 1, 1983. The explanation of the interest expense was that it was based upon a $ 10 million loan repayable in 96 equal installments of $ 178,420.16 in advance with interest at 15 percent. There were explanations of the depreciation item and other items shown in the projection. The last item under footnotes, which was note 10, stated: The at-risk rules limit a taxpayer's loss to the amount that the taxpayer has at risk and could actually lose from an activity. These rules apply to individuals, tax-option corporations and personal holding companies. Accordingly, in order to prevent the at-risk limits from applying to the losses shown, up to $ 6,750,901 of the non-recourse installment note must be converted to full recourse status in years 1983 through 1986. This full recourse portion will then fully amortize by 1990.
At the time this projection was sent by Mr. Jennings to representatives of Echo Glen, it had been Mr. Jennings' practice each year around December 15, certainly before December 31, to draw up an agreement by an investor *321 to be at recourse on the installment note to a predetermined amount, which in Mr. Jennings' opinion was sufficient to allow the investor to take full advantage of the loss deductions generated by the transaction for that year. However, by the end of 1982 the number of investors Mr. Jennings had in various computer leasing agreements had increased to such a point that it was administratively not feasible for Equity to prepare and send out to all of the investors a yearly agreement with respect to an amount of the installment note to become recourse. Therefore, starting in 1982 and continuing in 1983 Mr. Jennings drafted and sent out to investors agreements which in his opinion would cover the entire period that the individual needed to have a recourse liability on the note in order to obtain full benefit of the tax deductions. Mr. Jennings, as a representative of Equity, did not require that the amendment to the note to make a portion thereof recourse be signed and, in fact, when he had sent out yearly amendments to put a certain amount at recourse on a yearly basis, some years certain individuals had not signed the recourse amendments since for some reason in their judgment they *322 did not need the recourse liability to obtain their tax deductions. However, in Mr. Jennings' opinion the investment in the equipment sale and lease-back was a good investment only with the tax deferral aspect of the investment, and therefore he advised each investor to be sure that he had sufficient recourse amount to get the full tax deduction. In 1983 Mr. Jennings drafted an amendment to the nonrecourse installment notes of investors intended to cover the entire period during which the notes were being paid. Mr. Jennings in 1983 sent to Echo Glen an amendment to each of the installment notes, one in the Southern Bell purchase and the other in the Southern Pacific purchase, that covered all years until the installment notes were paid in full. Each of these documents was entitled "Amendment to Installment Note and Security Agreement dated as of September 30, 1982, by and between Echo Glen and Equity." The amendment in each case recited that the amendment is entered into by and between Echo Glen and Equity, referred to respectively as buyer and seller. It provided that buyer and seller agree to amend the above-referenced installment note and security agreement as follows: *323 1. The Buyer and Seller hereby agree to amend the above referenced Installment Note and Security Agreement such that the definition of the Buyer's Obligations, as such is used solely in the paragraph contained on page four of the Installment Note and Security Agreement which commences with the following phrase: "Seller agrees, for itself and its successors and assigns . . .",
shall no longer mean: "all liabilities of the Buyer to the Seller arising under the Installment Note and Security Agreement",
but shall instead mean: "all liabilities of the Buyer to the Seller which are in excess of the following amounts on and continuing after the specified dates: * * * "
The dates shown are December 15, 1983, and December 15 of each succeeding year through 1990, and each amendment has a different specified amount. Underneath the schedule setting forth the amounts in parenthesis appears "(which amounts as applicable are hereinafter referred to as the 'buyer's recourse obligation' arising under the installment note and security agreement)." [2] Paragraph 2 of the amendment to each of the installment notes and security agreements provides as follows: *324 2. In consideration of the Buyer entering into this Amendment and agreeing to be fully liable on a recourse basis for the Buyer's Recourse Obligation under the above referenced Installment Note and Security Agreement, the Seller and its Assignee: (i) reconfirm for the benefit of the Buyer, as regards that portion of the Buyer's Obligations which are in excess of the Buyer's Recourse Obligation, that: (a) such excess Obligations shall be satisfied solely out of the rentals and other sums payable under any lease of the Equipment securing this Installment Note, or any other use or sale of the Collateral; and (b) the Seller shall have no right to satisfy any of the Buyer's excess Obligations under the Installment Note or Security Agreement out of any other property of the Buyer, provided that nothing shall prevent the Seller from exercising its rights with respect to the Collateral in the event of nonpayment of such excess Obligations; and (ii) agree that if either: (a) the corporate bond rating of the lessee to whom the Seller is leasing the Equipment as published by Moody's Investors Service, Inc. falls below such lessee's rating as of the Commencement Date of the Original Term *325 of the Lease; or (b) the net worth of the lessee to whom the Seller is leasing the Equipment falls below such lessee's net worth as set forth in the most recent audited financial statement available as of the Commencement Date of the Original Term of the Lease, the Buyer may rescind this Amendment, in whole or in part, by tendering written notice to the Seller by registered mail, return receipt requested.
*326 The amendment is stated to be executed on December 15, 1983, on behalf of Equity and Echo Glen. The actual method by which the accounting records were handled in connection with the transactions here involved was that Southern Bell and Southern Pacific each sent their monthly rent checks to St. Joseph Bank. The monthly rent checks were in excess of the monthly payments due on the notes of Leasing purchasing the equipment and, therefore, the rental amounts were credited in payment in full of the monthly payments due by Leasing on the purchase money notes for the equipment and the balance was sent to Equity. [3] Equity did not send any actual monthly checks or otherwise transfer money monthly to Echo Glen in payment of the rent recited as due Echo Glen under the two leases in connection with the Southern Bell and Southern Pacific transactions, nor did Echo Glen actually send a check or otherwise transfer money to Equity for the monthly payments on the notes. The accounting arrangement was that Equity would show as an indebtedness on its books to Echo Glen the $ 185,086.83 monthly rental amount and would offset that amount by the $ 178,420.16 due by Echo Glen to Equity on the installment *327 notes. The net difference of $ 6,666, which amounted to $ 40,000 every 6 months, was accumulated, and every 6 months Equity would send a remittance advice to Echo Glen with its check for the $ 40,000 excess of rental over the amount due on the installment notes. The excess rentals received by Equity from St. Joseph Bank because of the excess rental payments of Southern Pacific and Southern Bell over the amount due on Leasing's installment notes were more than the amount needed by Equity to make the $ 40,000 payments every 6 months to Echo Glen. In late 1983 Mr. Arnold Berger and Mr. Kramer were told by their accountants that there should be some arrangement whereby the four stockholders of Echo Glen showed a greater investment or equity or basis in Echo Glen. He informed them that this was necessary in order to be entitled to tax deductions *328 from Echo Glen's computer transactions. The accountants suggested that each of the four stockholders sign a substitute promissory note comparable to the ones that they had been required to sign in connection with the recourse promissory note for the downpayment on the equipment and that they should each receive back from Echo Glen its note in the same amount thereby showing loans to Echo Glen. Someone from Echo Glen, either Mr. Berger or the accounting representatives of Echo Glen, requested Mr. Jennings to draw up notes for the stockholders for this purpose similar to those used as substitute promissory notes for Echo Glen's recourse promissory notes. At the bottom of the substitute notes signed by each stockholder under date of December 15, 1983, underneath the signature appears the following: This Promissory Note and Security Agreement is in substitution for $ 375,000 of the $ 10,000,000 Installment Notes and Security Agreements of Echo Glen Villas, Inc., executed on September 30, 1982. Accordingly, Echo Glen Villas, Inc. is hereby released from $ 375,000 of liability under the above referenced Installment Notes and Security Agreements.
There was no signature under *329 this notation, nor is there any reference in the substitute notes to the December 15, 1983, amendments to the installment notes. In each of the years 1984, 1985, and 1986 similar substitute notes were drawn up by Mr. Jennings at the request of some representative of Echo Glen and returned to Echo Glen and signed under date of December 15 of the respective year by each stockholder. Mr. Jennings had no interest in the substitute notes, since Echo Glen's installment note had not been assigned by Equity but was held by Equity. Mr. Jennings did not know whether the substitute notes were intended to be for what he considered the recourse part of the installment notes or the nonrecourse part, and the substitute notes did not state whether they were to substitute for the nonrecourse or purported recourse part of the Echo Glen installment notes, other than making no reference to the amendments to the installment notes. The notes drawn up and signed for years after 1983 were identical to the 1983 notes except as to amount. In each year Echo Glen gave a note back to each stockholder for the exact amount of the stated amount of the substitute promissory note signed by the stockholder for *330 that year in stated substitution for part of the $ 10 million installment notes. When Mr. Jennings discussed by telephone with the accounting representatives of Echo Glen and with Mr. Arnold Berger and Mr. Kramer the signing on behalf of Echo Glen of the amendments to the installment notes which he was sending to them, he explained that this was to be in lieu of the yearly amendments of the installment notes so that the investors could be at risk with respect to a portion of the installment notes to enable them to get a tax deduction under the at-risk provisions of the Code without having to sign yearly amendments. They did not have a discussion of the meaning of the word "rescind". The only explanation Mr. Jennings could recall giving to either Mr. Arnold Berger, Mr. Kramer, or the accounting representatives of Echo Glen was that it would save having to sign yearly amendments to the installment notes. Neither Mr. Arnold Berger nor Mr. Kramer ever checked to see whether there had been any change in the bond rating of either Southern Bell or Southern Pacific or if their net worth had fallen below what it was at the end of December 1982. Both Mr. Arnold Berger and Mr. Kramer understood *331 Mr. Jennings to tell them, and they thought, that the provisions of the amendments would permit Echo Glen to cancel the amendments on a yearly basis, since they understood Mr. Jennings to say that the amendments were a substitution for the yearly amendments which investors in computer equipment through Equity had signed in years prior to 1983. On January 10, 1985, Echo Glen Villas, Inc., Arnold Berger, Robert B. Kramer, Irving Berger, and Jack W. Berger, as plaintiffs, filed a suit against St. Joseph Equity Corp. and St. Joseph Bank & Trust Co. in the Marion County Superior Court of the State of Indiana in which they alleged that the plaintiffs and the defendant had entered into transactions for the sale and lease-back of certain electronic data processing equipment which involved purchase agreements, installment notes, security agreements, promissory notes and security agreements, and lease agreements, and that Arnold Berger, Robert B. Kramer, Irving Berger and Jack W. Berger executed promissory notes and security agreements in connection with this transaction. They alleged that plaintiffs were induced to enter into the agreement by specific statements, representations, and *332 assurances made by defendant's agents to plaintiffs that plaintiffs' performance pursuant to the terms under said transaction would safely allow declaration of substantial deductions for federal tax purposes which would result in substantial tax savings and benefits to the plaintiffs. Defendant made these representations intending that plaintiffs rely upon same and enter into the aforesaid agreement.
The complaint further alleges that at the time the defendant made these statements and representations, the defendant knew that they were false and that these statements were made both negligently and intentionally by the defendant to mislead the plaintiffs. The complaint further alleges that in reliance on these representations the plaintiffs entered into the agreement and performed pursuant to the terms until they became aware of the false and fraudulent nature of the defendant's statements, representations, and assurances. The plaintiffs further alleged that Because of the falsity of the defendant's statements and the actual and potential harm occasioned thereby to the plaintiffs, the plaintiffs have refused to make any further payments to the defendant and now seek rescission *333 and cancellation of said agreement and reimbursement of plaintiffs' losses and compensation for their damages sustained to date.
The plaintiffs further alleged that the defendant St. Joseph Bank & Trust Co. is an assignee of the installment notes and security agreements and is made a party to the suit to answer as to any interest it might assert in the aforesaid transaction. The prayer of the plaintiffs was that the agreement with the defendants be rescinded and canceled, that plaintiffs be reimbursed and made whole for their losses and damages sustained, that punitive damages be assessed against St. Joseph Equity Corp., and all other proper relief be granted. [4]
The individual petitioners on their Federal income tax returns for the years 1982 through 1987 took various amounts of deductions with respect to losses of Echo Glen or investment interest *334 expense of Echo Glen. Respondent, among other adjustments which have now been disposed of by agreement of the parties, disallowed these deductions in 1982, 1986, and 1987 to each of the individual petitioners. For the years 1983 through 1985 respondent increased the income of Echo Glen by the entire amount of loss claimed in connection with the computer leasing activities and disallowed the claimed investment interest expenses shown by Echo Glen on its returns. As previously stated, respondent has conceded that the notice of final S corporation administrative adjustment for 1985 was not sent to Echo Glen within the period of limitations provided for sending such a notice. OPINION The first issue for decision is whether we have jurisdiction with respect to the case of Echo Glen for the years 1983 and 1984. Petitioners argue that the notices of final S corporation administrative adjustment issued to Echo Glen for the years 1983 and 1984 were invalid because Echo Glen had only four shareholders and therefore was not subject to the unified audit and litigation procedures contained in sections 6241-6245 in effect during the years 1983 and 1984. Petitioners primarily rely on Arenjay Corp. v. Commissioner, 920 F.2d 269 (5th Cir. 1991), *335 and section 301.6241-1T(c)(2)(i), Temporary Proced. & Admin. Regs., 52 Fed. Reg. 3003 (Jan. 30, 1987). In Beard v. United States, 992 F.2d 1516, 1520 (11th Cir. 1993), the court specifically mentioned the section of the temporary regulations referred to by petitioners and states: On January 30, 1987, * * * the Secretary of the Treasury promulgated a temporary regulation defining S corporation for purposes of the unified litigation procedures. See 26 C.F.R. sec. 301.6241-1T(c) (1987). * * * The regulation provides that, in general, the term "S corporation" means "any corporation required to file a return under section 6037(a)." * * * [but] excludes from the definition "small" S corporations * * * with 5 or fewer shareholders, each of whom is a natural person or an estate. * * * [Fn. ref. omitted.]
The court then went on to point out that The regulation unequivocally limits the exception for small S corporations "to any taxable year of an S corporation the due date of the return for which * * * is on or after January 30, 1987." * * * Consequently, all S corporations whose returns were due before January 30, *336 1987, are deemed to be S corporations subject to the requirements of the SSRA.
Here, of course, the years involved are 1983 and 1984 and the returns were due before January 30, 1987. Likewise, this Court in a reviewed opinion, Eastern States Casualty Agency, Inc. v. Commissioner, 96 T.C. 773, 781 (1991), referred to section 301.6241-1T(c)(2)(i), Temporary Proced. & Admin. Regs., supra, as being applicable to a return filed on or after January 30, 1987. We therefore conclude that the years 1983 and 1984 here involved are not covered by the temporary regulations excepting S corporations with five or fewer shareholders from the provisions of the unified audit and litigation procedures. Both Beard v. United States, supra, and Eastern States Casualty Agency, Inc. v. Commissioner, supra, concluded that all S corporations regardless of the number of shareholders were subject to the unified audit and litigation procedures provided for in sections 6241-6245 for the years 1983 and 1984. Our reasons given in the Court-reviewed case of Eastern States Casualty Agency, Inc., and *337 those given by the Court of Appeals for the Eleventh Circuit in Beard, amply support this conclusion. We rely on the conclusions and reasoning in those cases and consider further discussion unnecessary. Petitioners in their brief actually recognize that since an appeal in these cases would be to the Court of Appeals for the Eleventh Circuit, we are bound by the Court of Appeals' holding in Beard v. United States, supra, with respect to the jurisdiction of this Court under the unified audit and litigation procedures with respect to an S corporation of four shareholders for the years 1983 and 1984. Petitioners also mention our Court-reviewed case of Eastern States Casualty Agency, Inc. v. Commissioner, supra, but they argue that the position of the Court of Appeals for the Fifth Circuit in Arenjay Corp. v. Commissioner, supra, is a better legal holding and ask that in spite of our Court-reviewed opinion and the opinion of the Court of Appeals for the Eleventh Circuit we reconsider our position. For the reasons stated in Eastern States Casualty Agency, Inc. v. Commissioner, supra, *338 and Beard v. United States, supra, we hold that we do have jurisdiction under the unified audit and litigation procedures with respect to the years 1983 and 1984 in the case of Echo Glen. The second issue for decision is whether petitioners were at risk within the meaning of section 465 with respect to any part of the purchase price of the equipment Echo Glen purchased from Equity which was on lease to Southern Bell and Southern Pacific. Petitioners argue that they were at risk with respect to the cash downpayment made for the equipment and the recourse promissory notes to the extent of $ 2 million and were also at risk on the installment notes with respect to a sufficient amount to entitle them to the deductions claimed. In our view, the application of the at-risk issue to the $ 2 million of downpayment in cash and the recourse promissory notes is different from the at-risk issue with respect to any amounts represented by the $ 10 million installment notes. We will therefore discuss the items separately. Echo Glen and its stockholders were at risk with respect not only to the cash downpayment made to Equity, but also with respect to the recourse *339 notes given for the remaining part of the $ 2 million under the facts we have found. Respondent's primary argument against the recourse liability with respect to the $ 2 million is a different interpretation of some of the facts in this record from the facts we have found. Respondent argues that the record is not sufficient to show that the cash downpayment was made or that the substitute notes given by the four stockholders for Echo Glen's promissory note were in fact paid. The record is unfortunately not unequivocally clear in this respect. There are some checks in the record, but not all of those checks are in payment of either the cash amount or the amounts on the stockholders' substitute notes. However, Mr. Jennings testified that the entire $ 2 million was paid and timely paid, and Mr. Arnold Berger in effect testified to the same effect, though not as clearly, and Mr. Kramer also so testified. Based on the record, we have found that the entire $ 2 million was paid. Petitioners argue that since the notes were recourse, it is immaterial whether or not payment was made. Petitioners' position is correct absent some showing that there was not an intent to make payment or *340 that the amount was protected against loss within the meaning of section 465(b). In the years 1983 and 1984 full payment had not been made on the recourse promissory notes. The statute defines an at-risk amount to include recourse indebtedness absent some agreement indemnifying the maker or some other reason shown why the amount would not be paid. We therefore hold that Echo Glen and its stockholders were at risk for the entire $ 2 million downpayment. The record shows that Equity required the stockholders to substitute their recourse notes for the recourse notes of Echo Glen. The reason for this requirement is not specifically stated, but as we have set forth in our findings, Echo Glen's major if not only asset other than $ 500 paid in as capital stock if that asset remained, was the computer equipment. Therefore, obviously since the promissory notes were a part of the downpayment on the equipment and were recourse, Equity wanted notes from persons able to pay the amount. The substitute notes by the shareholders, which were accepted and required by Equity, were effectively a further investment by the shareholders in Echo Glen, and therefore these amounts plus the cash payment *341 by Echo Glen represent at-risk liability of Echo Glen and the shareholders. Respondent makes some argument here, as she also does later with respect to the installment notes, that the shareholders did not have adequate basis in Echo Glen to be entitled to deductions for the full $ 2 million for which Echo Glen was at risk when the shareholders' substitute notes are considered part of the at-risk amount. However, neither at trial nor in her trial memorandum or at any point prior to brief did respondent specifically question whether the basis of petitioners-stockholders in Echo Glen was sufficient to allow them the pass-through losses and deductions from Echo Glen, if Echo Glen actually sustained losses or had deductions which were properly pass-through losses and deductions. We, therefore, will not consider this issue since it was not properly raised. The application of the at-risk provisions to the installment notes is much more complicated. The initial installment notes signed by Echo Glen were nonrecourse notes. Neither party denies this fact. It is petitioners' position that the amendments to the installment notes executed on behalf of Echo Glen on December 15, 1983, put *342 the amounts set forth therein at risk. Respondent contends that the amendment was ineffective for a number of reasons. First, respondent states that there was no consideration for the amendments, and, therefore, they would be unenforceable. A second reason stated by respondent for the amendment being ineffective is that Echo Glen had no assets other than the computer equipment to be at risk and, therefore, there was no substance to the claim that Echo Glen was at risk. Respondent also argues that realistically under the facts here, there was no reasonable possibility that any attempt would be made to collect any portion of the installment notes other than from rental payments by the end-users of the equipment or from a sale of the equipment which facts amount to "other similar arrangements" under section 465(b)(4). Finally, respondent argues that the provision with respect to rescission of the amendments if the bond ratings of Southern Bell or Southern Pacific decreased or their net worth decreased is the equivalent of a stop loss agreement under section 465(b)(4) if otherwise the amendments could be considered to put Echo Glen "at risk" on the installment notes. Section 465 *343 provides that persons engaged in an activity to which section 465 applies are entitled to deduct losses from such activity in a particular year only to the extent they are "at risk" with respect to such activity at the end of the year. Leases such as the ones here involved are an activity to which section 465 applies. Section 465(b) provides that a taxpayer shall be considered at risk for an activity with respect to amounts of money and adjusted basis of other property contributed by the taxpayer to the activity and amounts borrowed with respect to such activity to the extent of his personal liability for the borrowed amount. Sec. 465(b)(2). Section 465(b)(4) provides that notwithstanding any other provision of section 465, a taxpayer shall not be considered at risk with respect to amounts protected against loss through nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements. Petitioners make no contention that the amendments to Echo Glen's installment notes totaling $ 10 million were entered into for any purpose other than to permit the obtaining of tax deductions with respect to the computer equipment transactions. It is their argument that all *344 the statute requires is that Echo Glen be at risk and that the reasons for entering the transactions are immaterial. While the reasons for entering the transactions are part of the overall aspects to be considered in connection with determining whether a taxpayer is at risk, we agree with petitioners that if the taxpayer is actually at risk and personally liable with respect to an amount, the reason why he became at risk and personally liable would not be controlling. However, in our view all facts and circumstances surrounding the transactions are to be considered to determine whether realistically and substantively the taxpayer is personally liable for the borrowed amount. In Young v. Commissioner, 926 F.2d 1083, 1088 (11th Cir. 1991), affg. T.C. Memo. 1988-440, the court pointed out that transactions under section 465 must be viewed in accordance with economic reality. See also Moser v. Commissioner, 914 F.2d 1040, 1048 (8th Cir. 1990), affg. T.C. Memo. 1989-142, and American Principals Leasing Corp. v. United States, 904 F.2d 477, 483 (9th Cir. 1990), *345 cited in a footnote in the Young case. These cases and Waters v. Commissioner, 978 F.2d 1310, 1317 (2d Cir. 1992), affg. T.C. Memo. 1991-462, hold that unless a taxpayer is realistically liable for repayment of the borrowed funds if payment through rentals of the equipment securing the debt, plus the value of the equipment, are insufficient to pay the indebtedness in full, he is not at risk with respect to such borrowed funds. Some of the cases stress that if there is not realistic liability on the taxpayer to repay, he is not at risk. Others stress that numerous agreements intended to protect the initial purchasers of the equipment from liability, which have a provision for "recourse" liability for the taxpayer ultimate purchaser, which if enforced would enrich the initial purchaser, so that it is clear that they will never be enforced, are in the nature of "other similar arrangements" under section 465(b)(4) protecting the taxpayer from loss. As we pointed out in Thornock v. Commissioner, 94 T.C. 439, 450 (1990): the significant tax-oriented aspects of such transactions [equipment *346 leasing] require that the availability of the tax benefits be determined by the true underlying economic substance of the transactions and not by features of the transactions that are mere window dressing and that serve no economic purpose.
In these cases there was no consideration for the amendment to the $ 10 million installment notes by Echo Glen. The recited consideration was leaving the balance of the notes nonrecourse. However, the total amount of the notes was nonrecourse prior to the amendment. In these cases we have testimony of the president of Equity, which held the notes. He in effect testified that he did not require a signing of the amendments to the nonrecourse installment notes to make them partially recourse, and in fact when amendments were made on a yearly basis, some investors did not sign some of the yearly amendments. However, he stated that he thought an investor would be foolish not to sign to make a part of the notes recourse since the investment was not a very good investment except for the tax benefits. Therefore, not only is no consideration shown for signing of the amendments, but in fact it is shown to have been a voluntary act rather than a *347 requirement of the transactions. See Peters v. Commissioner, 89 T.C. 423, 442-443 (1987). We conclude that the amendments to the installment notes by Echo Glen were unenforceable because of lack of consideration. Petitioners argue that the four shareholders of Echo Glen were at risk because of the substitute notes they signed each year beginning December 15, 1983, with a statement at the bottom of each substitute note that it was in replacement of a portion of the $ 10 million installment note executed by Echo Glen on September 30, 1982. Petitioners, citing such cases as Abramson v. Commissioner, 86 T.C. 360 (1986), conclude that these substitute notes made the individual petitioners liable to Equity on a recourse basis for the amount stated therein. However, there is no indication that the substitute notes were for a portion of the claimed at-risk part of the installment notes rather than the nonrecourse portion. In fact, since the substitute notes refer only to the installment note of Echo Glen executed September 30, 1982, a reasonable interpretation is that they were not intended to cover the so-called recourse *348 amendment executed December 15, 1983, on behalf of Echo Glen. This record is clear that Mr. Jennings, who was the president and who acted on behalf of Equity, neither required nor requested the substitute notes for the installment notes of Echo Glen. Abramson v. Commissioner, supra at 375, points out that the at-risk provisions were enacted to prevent a taxpayer from deducting a loss in excess of his economic investment in a particular activity at the close of the taxable year. In Abramson, we stated that a taxpayer is generally considered to be at risk as to any amounts borrowed for use in an activity with respect to which the taxpayer has personal liability for payment from his personal assets. We then stated: This case involves an obligation on which each partner, general and limited, is directly liable to the seller of the film. The nonrecourse form of the obligation was used to avoid joint and several liability among the partners, and the "guarantee" was simply the means by which each partner agreed with the seller to be personally liable for a specific portion of the debt.
Id. at 375-376. This *349 guarantee agreement for personal liability between the partners and the seller is in stark contrast to the situation here with respect to the substitute notes for the installment notes. The seller, Equity, never requested the substitute notes with respect to the $ 10 million installment notes and had no interest in them. There is nothing in this record to show that Equity ever accepted these substitute notes in substitute for Echo Glen's installment note or that any part of the substitute notes were recourse. For this reason, this case is distinguishable from Abramson v. Commissioner, supra, where there was direct liability of the partners to the seller on the promissory note. Here there is no showing that the stockholders had any liability and certainly no recourse liability to Equity on the substitute notes for the installment notes. These substitute notes did not purport to be in substitution for any recourse part of the installment notes. A note was given by Echo Glen back to each of the stockholders in the same amount as the amount stated to be covered in the substitute notes with respect to the installment notes. Although there is some *350 confusion in the testimony of Mr. Arnold Berger and Mr. Kramer, it is clear that Mr. Kramer understood the stockholders of Echo Glen were not liable for the debts of Echo Glen unless such debts were guaranteed or assumed by them. We consider the record to indicate that Mr. Arnold Berger also understood this fact. Therefore, they must have understood that unless they had in some way guaranteed or assumed a "recourse" liability of Echo Glen, they were not personally liable for the debt. The cases relied on by petitioners as recognizing "at risk" guarantors have involved a direct obligation of a limited partner (we have found no cases involving stockholders of an S corporation) to the seller on a recourse basis. Here, there is no such situation. The substitute notes of the stockholders here, which were drawn up on behalf of the stockholders at their request, were an attempt to create a loan from the stockholders to Echo Glen to establish a further basis in Echo Glen for the stockholders. There is no showing that these substitute notes created any recourse liability on the part of the stockholders to Equity or to Echo Glen. It is clear that the only substantial asset that Echo *351 Glen had was the computer equipment it purchased which was being paid for by the installment notes. Therefore, if some form of default occurred, there would be nothing that Echo Glen had from which any creditor could collect once the computer equipment had been used to satisfy the initial note. Realistically Echo Glen had no "at-risk" liability on the installment notes. Finally, here there was a setup whereby, realistically, the installment notes were paid by the rental payments made by Southern Pacific and Southern Bell, similar to the situation in Young v. Commissioner, 926 F.2d 1083 (11th Cir. 1991), affg. T.C. Memo. 1988-440, Thornock v. Commissioner, 94 T.C. 439 (1990), Wimpie v. Commissioner, T.C. Memo. 1994-41 and the record shows that the note given by Leasing in initial payment for the equipment was nonrecourse and was to be paid by the assignment of rental payments from the leases. These notes were secured solely by the leases and equipment. No liability was assumed by Equity to Leasing or on Leasing's notes. Equity had no recourse liability with respect *352 to the transactions. The record shows that the leases with Echo Glen as lessor and Equity as lessee provided specifically that Equity's (the lessee's) obligation for the payment of rents or other sums under the lease would "be satisfied solely out of the rentals and other sums payable under the present or subsequent subleasing of the equipment" and none of the lessee's obligation under the lease should be satisfied out of other property of the lessee. Mr. Jennings testified that if the end-user lessees, Southern Pacific or Southern Bell, quit making payments, there was no obligation on Equity to make any further payments to Echo Glen. Echo Glen's installment note payments were made by being credited against the rental payments stated in the leases of the equipment to Equity by Echo Glen to be rental payments for the equipment. However, since Equity was obligated to make such payments "solely out of the rentals" paid by Southern Pacific and Southern Bell, in substance the payments of Echo Glen's installment notes were from the rental payments by Southern Pacific and Southern Bell. Mr. Jennings in his testimony at certain points stressed the fact that the transactions between Leasing *353 and St. Joseph Bank and Leasing and Equity were separate and apart from the transactions between Equity and Echo Glen. He stressed that Echo Glen owed Equity on the installment notes and Equity owed rent to Echo Glen in a transaction separate and apart from the transactions between Leasing and St. Joseph Bank and Leasing and Equity. However, when questioned about whether there would not always be the amount of the offset of rent against the installment notes so that the installment notes would continue in that way to be paid, he called attention to the provision in the lease to Equity by Echo Glen that if the payment of the rental amount from the end-users, Southern Bell and Southern Pacific, ceased, Equity would not be required to pay Echo Glen and, therefore, there would be no rent to offset the payments due on the installment notes. In fact, he stated that except for that provision Equity would by its rental payment agreement be insuring the end-user's obligations. Although there are more agreements here than in Young v. Commissioner, supra, the same fact exists that the only funds for the payment of the installment notes were the rental payments *354 on the leases by Southern Bell and Southern Pacific. Mr. Jennings testified that while he might not attempt to enforce Echo Glen's installment notes if Southern Bell and Southern Pacific quit paying rent and the equipment could not be released and was sold for less than needed to satisfy the bank loans to Leasing, that the bank might "find out" about the Echo Glen notes, even though they were not assigned to the bank, as recourse notes, and attempt to enforce them. Mr. Jennings speculated that the banks might consider the installment notes of Echo Glen to Equity to be "proceeds of the equipment held as security" under Leasing's notes. The reference to "proceeds" of the equipment in Leasing's notes to the bank appears to us to refer to a re-leasing of the equipment or a sale of the equipment by Leasing to satisfy its notes to the bank. All transactions after Leasing's placing the leases and equipment as security for the bank loans were subject to prior liens and assignments of security interests in the equipment. If the banks had considered the notes of Echo Glen to Equity as "proceeds" of the sale of the equipment, they would have required that the notes be assigned to them. *355 Furthermore, Echo Glen would have the defense to the notes of lack of consideration. Finally, any attempt to enforce the notes against Echo Glen would be futile since its only substantial asset was its interest in the computer equipment. Here, although affected by numerous agreements including assignments and reassignments of the same equipment and leases, the substance of the transactions, as in Young v. Commissioner, supra, and other similar cases, was the payment of the Echo Glen installment notes through circular book entries dependent on lease rental payments by end-users with the intervening parties having no personal liability. Under the holding in Young v. Commissioner, supra, and similar cases, we conclude that except for amounts paid each year on the installment notes which will be later discussed, neither Echo Glen nor its stockholders was realistically at risk on any portion of the installment notes. Regardless of having made a determination which in our view disposes of the issues in these cases, we consider it appropriate to discuss the so-called amendments to the installment notes in light of *356 the statements in Barton v. Commissioner, 893 F.2d 306 (11th Cir. 1990), vacating and remanding T.C. Memo. 1988-396. In that case the Court of Appeals for the Eleventh Circuit vacated our decision and remanded for trial de novo, holding as error the holding of this Court that it was unnecessary to consider evidence of the intent of the parties in using the word "rescind" in an amendment to a note comparable to the ones here involved. Barton v. Commissioner, supra, was a fully stipulated case, and on remand the Court of Appeals for the Eleventh Circuit suggested that this Court not rely on stipulations or documents alone, but take evidence from the persons who structured the various transactions. In the cases here, evidence has been received in connection with the provisions of the amendments to the installment notes. However, neither party called as witnesses petitioners' accountants, with whom most of the discussions by Mr. Jennings about all the transactions with respect to the purchase by Echo Glen of the equipment leased to Southern Pacific and Southern Bell took place. Respondent *357 takes the position that there is no ambiguity in the provisions of the amendments to the notes with respect to the right of Echo Glen to "rescind" the contract. It is respondent's position that under the generally accepted definitions of "rescind" the word is unambiguous. Petitioners take the position that the word "rescind" is ambiguous and that if the word as such were not ambiguous, the reference to rescind "in whole or in part" would make the rescission paragraph of the amendments to the installment notes ambiguous, since if rescind means to make void ab initio, this could be done only in whole and not in part. Black's Law Dictionary 1306 (6th ed. 1990), under "rescind", refers to rescission of contract where the first sentence states: "To abrogate, annul, avoid, or cancel a contract; particularly, nullifying a contract by the act of a party." The word "cancel", which is used as one of the meanings of "rescind" as defined in Black's Law Dictionary, is defined in that dictionary as: To obliterate; to strike or cross out. To destroy the effect of an instrument by defacing, obliterating, expunging, or erasing it. To revoke or recall; to annul or destroy, make void or invalid, *358 or set aside. To rescind; abandon; repeal; surrender; waive; terminate. * * * [Id. at 206.]
At the end of the definition, under "See also", is included the word "rescind" and the phrase "rescission of contract". Since "termination" is a word which means to end rather than to make void ab initio, we conclude that although the definition of "rescind" and "rescission" is primarily dealing with the voiding of a contract ab initio, it is not without some ambiguity. For this reason, we conclude that in an amendment to a note that refers to a right to "rescind" the amendment in whole or in part, there is sufficient ambiguity to permit the taking of parol evidence as to the meaning of the word as used in the agreement between the parties. Mr. Jennings, the president of Equity, testified with respect to his discussions with petitioners' accountants and with the officers and stockholders of Echo Glen. He stated that he discussed the original papers with petitioners' accountants and that we went through the fact that we had on lease equipment to different users, other than just Southern Bell and Southern Pacific at the time. And we discussed whether or not they would like *359 to make the installment note partially recourse at inception, or whether they wanted to do the subsequent-amendment approach.
Mr. Jennings testified that after the documents were sent out there were additional telephone calls "dealing with questions on the face of it." Mr. Jennings testified that he drafted the documents involved in the transaction including the amendments to the two installment notes and had his tax counsel review them. In response to a question whether "with regard to these graduated amounts can you tell us what your intent was in drafting the form this way", Mr. Jennings answered: "the intent was not to have to do annual amendments as we had been doing in 1980 and 1981." Mr. Jennings testified that on an annual amendment basis a person essentially could choose whatever dollar amount he wanted, but on a one amendment basis, because it was on a schedule of increases and decreases, he put in an option to change in whole or in part the future schedule dollar amounts depending upon whether or not certain conditions were met. He explained that had the at-risk amounts in the Echo Glen notes been done on an annual basis, there would have been eight separate annual *360 amendments dated December 15, 1983, through December 15, 1990, each one of which would have had the dollar amounts as indicated on the schedule on the amendments to the installment notes signed by Echo Glen. He testified that in December 1982 he started using the amendments to the installment notes that covered the entire period of the sale/leaseback transaction with respect to all his investors. He said this was done as a general rule except that it was not needed "in those cases where individuals like Conway Brown had gone partially recourse, at inception, or myself". He stated that the provision with respect to rescinding was put in "to try and emulate the effect of the annual amendment in this document". He stated that his "intent was to choose a standard that neither party, St. Joseph Equity or the owner, really controlled, but was an objective standard that might be relevant to a decision to change a recourse commitment." Mr. Jennings testified that he drafted the language in the amendments to the installment notes under paragraph 2.(ii) because "people's circumstances change during that period of time [an 8- to 10-year lease] and they may or may not have need for as much *361 of the deduction potential as these projections allowed so they could choose to change their at-risk basis to vary how much of their pretax loss that came from the projection would be included in that year's return." Mr. Arnold Berger and Mr. Kramer both testified with respect to conversations with Mr. Jennings about the amendment to Echo Glen's note. The testimony of Mr. Arnold Berger and Mr. Kramer with respect to their understanding of the amendment to Echo Glen's installment note is quite confusing. However, both did insist that they thought "rescind" meant Echo Glen could cancel the notes. From the testimony of Mr. Jennings, Mr. Arnold Berger, and Mr. Kramer, it is apparent that there was no clear understanding among these parties as to exactly what the last paragraph in the amendment to the installment note, in which the word "rescind" is used, meant. It is clear from Mr. Jennings' testimony that he was of the impression that the amendments placed no recourse liability on the individual stockholders of Echo Glen, but only on Echo Glen. From the testimony of Mr. Arnold Berger and Mr. Kramer, it appears that they were confused between the recourse liability of Echo Glen *362 and recourse liability of the stockholders individually. It is difficult to understand this confusion since they were sophisticated businessmen and had transactions with a number of S corporations which they owned. Certainly Mr. Kramer understood that unless you guaranteed or assumed the personal liability of an S corporation, you were not personally liable, even if the S corporation were liable. Neither Mr. Arnold Berger nor Mr. Kramer testified that he knew whether the "substitute" notes were intended to substitute for nonrecourse or so-called recourse liabilities of Echo Glen's notes. There is substantial confusion in the record. It finally becomes clear from Mr. Kramer's testimony that he knew he was not personally legally obligated on the installment notes of Echo Glen to Equity whether recourse or nonrecourse. It is very difficult to determine what parties to a transaction considered a word in their agreement to mean when the record as a whole so clearly shows that none of the parties involved believed that, in fact, there would ever by any personal liability of the stockholders of Echo Glen with respect to the installment notes or that any attempt would ever be made to *363 enforce those notes. The record as a whole shows that the amendments to the installment notes were executed solely in an effort to obtain tax benefits without, in fact, creating any personal liability on any of the parties. However, on the limited issue of the meaning of the word "rescind", we conclude that there was no discussion between the parties as to the meaning of this word, but there was discussion that if one of the events listed occurred, they would be able to cancel any balance on the recourse part of Echo Glen's installment note if, in fact, there was a recourse part. Mr. Arnold Berger and Mr. Kramer each testified that he did not check to see if any of the listed events had occurred. The record shows that Southern Bell's net worth decreased at the end of 1984 and Southern Pacific's bond rating fell in 1987. Our conclusion is that under the facts in this case there was no realistic possibility that either Echo Glen or its stockholders would ever be personally liable with respect to the installment notes, and the payment of the installment notes was entirely dependent on the rental payments by Southern Pacific and Southern Bell. In this respect this case is not distinguishable *364 from Young v. Commissioner, 926 F.2d 1083 (11th Cir. 1991), affg. T.C. Memo. 1988-440, and other similar cases on which we have relied. In each of those cases there was a stated recourse liability in the notes. Our conclusion with respect to the parties' understanding of the meaning of the word "rescind" here means only that they understood that Echo Glen could cancel the stated recourse liability in the installment notes. This is not a conclusion that substantively and realistically any such recourse liability existed under the circular payment method, which depended entirely on the rental payments by Southern Pacific and Southern Bell. Each year as payments on the installment notes were made, Echo Glen became "at risk" for the principal amount paid, since such payments were in effect "cash" payments which increased its equity in the computer equipment. In 1983 and each year thereafter the yearly principal payment represented an at-risk amount for that year. This record contains facts from which the amount of payment of principal on the installment notes can be computed for 1983 and each subsequent year. These amounts *365 can be computed by the parties, and to the extent of these payments each year petitioners were "at risk" and therefore entitled to a deduction to that extent of the losses or other deductions with respect to the computer equipment transactions. It appears that for the year 1982, the entire $ 2 million downpayment recourse amount would not have been absorbed, and the unabsorbed amount of recourse liability would be carried into 1983 to add to the amount of the principal payment on the notes for that year to arrive at the "at-risk" amount. Since respondent admits that 1985 is barred by the period of limitations, the amount claimed in that year would, of course, be unchanged. In 1986 the amount petitioners would be entitled to deduct would be the amount of principal paid on Echo Glen's installment notes in 1986. Since 1986 apparently was the last year that the transactions as handled by petitioners showed a loss, in 1987, petitioners would be entitled to offset against any gain, any carryover from 1983, 1984, or 1986, needed to offset the income flow in 1987. Section 6661 as applicable to the years here involved provided that if there was a substantial understatement of income tax *366 for any taxable year, there should be added to the tax an amount equal to a stated percent of the amount of the underpayment attributable to such understatement. An understatement of income tax for any taxable year was defined as substantial if the amount of the understatement exceeded 10 percent of the tax required to be shown on the return for the taxable year or $ 5,000. The statute also provided that the amount of the understatement should be reduced by that portion of the understatement which was attributable to the tax treatment of any item by the taxpayer if there is or was substantial authority for such treatment. In the present case, we have decided that for the year 1982, there was no understatement by petitioners with respect to the equipment leasing transaction involving equipment of which Southern Bell and Southern Pacific were the end-user lessees. Therefore, there would be no understatement for 1982 with respect to the computer leasing transactions to which section 6661 would apply. The years 1983, 1984, and 1985, involved only a determination with respect to Echo Glen, the subchapter S corporation, and do not involve additions to tax under section 6661. In fact, *367 respondent, although determining additions to tax for 1982, in her brief argues only for the section 6661 addition for 1986. Petitioners argue that even if our determination with respect to the at-risk dispute is contrary to their position, they should not be held liable for the section 6661 addition to tax since there was substantial authority supporting their position with respect to the disallowed items that resulted in the substantial understatement. From the many cases involving computer leasing transactions that have been decided in this Court, it is apparent that transactions comparable to the ones involved in this case were used by many taxpayers during the years involved in this case. Some cases involving the sale and leaseback of computer equipment under circumstances somewhat like those present in the instant case have been recognized as supporting the deductions claimed, and the facts have been held to show that the taxpayer was at risk. Certainly a number of cases have analyzed and considered the complicated transactions involved in computer leases of the type here involved and concluded, as we have here, that the taxpayers were not entitled to the full deductions *368 claimed because of not being at risk with respect to the amount necessary to allow such deductions under section 465. However, in the situation prevalent with respect to computer equipment leasing, we have in a number of instances concluded that the taxpayer had substantial authority for claiming the deductions even though in analyzing the transaction we concluded that, realistically, the amount claimed by the taxpayer as being at risk was not at risk. See Wimpie v. Commissioner, T.C. Memo. 1994-41; Wag-A-Bag, Inc. v. Commissioner, T.C. Memo. 1992-581; Waters v. Commissioner, T.C. Memo. 1991-462, affd. 978 F.2d 1310 (2d Cir. 1992). Considering all of the circumstances in this case, we conclude that there was substantial authority for the position taken by petitioners, and therefore, do not sustain the section 6661 additions to tax. Petitioners also argue that they should not be held liable for the section 6661 addition to tax because of reliance on their tax advisers and accountants in entering into the transactions, citing Heasley v. Commissioner, 902 F.2d 380 (5th Cir. 1990), *369 reversing T.C. Memo. 1988-408. However, petitioners did not call their accountants and other advisers as witnesses to testify with respect to these transactions. There is no detailed testimony by petitioners themselves as to the advice they received from their accountants. Therefore, petitioners have failed to show what advice, if any, of their accountants they relied on. Since petitioners have not shown sufficient facts with respect to the advice they relied on, we do not pass on whether if the proper facts had been shown, this would be an acceptable reason for concluding that the addition to tax under section 6661 was not applicable. Furthermore, we do not have to consider this contention by petitioners since we have concluded for other reasons that petitioners are not liable for the addition to tax under section 6661. Section 6621(c) as applicable to the years here involved provided for a special interest rate on substantial underpayments attributable to tax-motivated transactions. In general it provided for an interest rate with respect to any substantial underpayment attributable to tax-motivated transactions in excess of the rate otherwise applicable. *370 A substantial underpayment attributed to tax-motivated transactions was defined to mean any underpayment of taxes for a taxable year attributable to one or more tax-motivated transactions, if the amount of the underpayment for such year attributable to such transactions exceeds $ 1,000. In defining tax-motivated transactions, section 6621(c)(3) specifically provided that any loss disallowed by reason of section 465(a) is a tax-motivated transaction. Since we have held that a part of the losses and deductions claimed by petitioners with respect to the leasing transactions here involved is to be disallowed because petitioners were not at risk with respect to a part of the indebtedness applicable to the transactions, it follows under the statutory definition that the transactions here were tax-motivated transactions. Therefore, under the clear wording of the statute, petitioners are subject to the additional interest with respect to the transactions here involved in any year in which the underpayment of taxes resulting from the disallowance of losses and deductions with respect to the transactions exceeds $ 1,000. Larsen v. Commissioner, 89 T.C. 1229, 1279 (1987), *371 affd. in part, revd. in part on other issues and remanded sub nom. Casebeer v. Commissioner, 909 F.2d 1360 (9th Cir. 1990). We, therefore, sustain respondent's determination of increased interest under section 6621(c) in any year in which the redetermination of petitioners' tax liability shows that the liability resulting from our partial disallowance of the losses and deductions claimed with respect to the computer leasing transactions exceeds $ 1,000. Decisions will be entered under Rule 155. Footnotes
1. Cases of the following petitioners are consolidated herewith: Irving Berger, docket No. 19150-90; Robert and Janet Kramer, docket No. 19157-90; Jack and Rose Berger, docket No. 19269-90; Robert and Janet Kramer, docket No. 6164-91; Arnold and Judith Berger, docket No. 6165-91; Echo Glen Villas, Inc., Jack Berger, A Person Other Than the Tax Matters Person, docket No. 18516-91; Arnold and Judith Berger, docket No. 16893-92; Irving Berger and Estate of Rose Berger, Deceased, Irving Berger, Personal Representative, docket No. 16894-92; Rose Berger, Estate of Jack Berger, Deceased, Arnold Berger, Personal Representative, and Rose Berger, Surviving Spouse, docket No. 16895-92; Robert and Janet Kramer, docket No. 16896-92.↩
1. This amount cannot be determined at this time. ↩
1. This amount cannot be determined at this time. ↩
1. This amount cannot be determined at this time.↩
1. This amount cannot be determined at this time.↩
2. The amounts shown as at recourse in the installment notes after the specified dates were as follows: ↩
As to the Southern Pacific equipment:
December 15, 1983
$ 1,541,000
December 15, 1984
3,058,000
December 15, 1985
4,417,000
December 15, 1986
5,594,000
December 15, 1987
4,492,000
December 15, 1988
3,223,000
December 15, 1989
1,761,000
December 15, 1990
74,000
As to the Southern Bell equipment:
December 15, 1983
$ 339,000
December 15, 1984
672,000
December 15, 1985
970,000
December 15, 1986
1,228,000
December 15, 1987
986,000
December 15, 1988
708,000
December 15, 1989
387,000
December 15, 1990
17,000
3. Mr. Jennings' testimony was that the balance was sent to Equity. However, he did not state the specific agreement that provided for these amounts being received by Equity.↩
4. There is nothing in this record to show whether this suit is still pending, has been settled, or what other action, if any, has been taken in connection therewith.↩